**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| Leslie Weller, an individual, | ) |
| | ) Case No. 1:17-cv-08799 |
| Plaintiff, | ) |
| | ) Judge John Robert Blakey |
| v. | ) |
| | ) Magistrate Judge Jeffrey Cole |
| Gillian Flynn, Penguin Random House LLC | ) |
| d/b/a Crown Publishing Group, Bruna | ) Jury Demand |
| Papandrea, Laura Jeanne Reese Witherspoon, | ) |
| Leslie Dixon, Twentieth Century Fox Film | ) |
| Corporation, and David Fincher. | ) |
| | ) |
| Defendants. | ) |

<u>**First Amended Complaint for Copyright Infringement**</u>

**NOW COMES** Plaintiff Leslie Weller, by and through her attorneys at Ziliak Law LLC, and for her

First Amended Complaint against the above-named Defendants states as follows:

**Nature of the Action**

1.  This is an action for copyright infringement brought by Plaintiff, Leslie Weller, author and

    owner of the original dramatic work *Out of the Blue,* against the author of the book *Gone Girl*, a

    popular thriller novel (the "Novel"), the Novel's publisher and distributor, and the producers,

    distributors, and director of the film *Gone Girl* (the "Film").  Plaintiff first wrote *Out of the Blue* in

    2005 and then revised it between 2005 and 2008.  The Novel was first published in 2012.  The

    Film was released in 2014, starred Ben Affleck, Rosamund Pike, Neil Patrick Harris, and Tyler

    Perry, and was directed by David Fincher.

**Jurisdiction and Venue**

2.  This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331, 1338(a), as it is an

    action arising under an Act of Congress relating to copyrights, namely, the Copyright Act of

    1976, 17 U.S.C. § 101 et seq.

3. This Court has personal jurisdiction over Defendants under Fed. R. Civ. P. 4(k) and 735 ILCS § 5/2-209(a)(2) because, without limitation and as set forth more fully below: (i) Defendants have targeted sales of the Novel, Film, and related infringing works at Illinois residents; (ii) this litigation arises out of Defendants' targeted sales of the Novel, Film, and related infringing works at Illinois residents; and (iii) Defendants should reasonably expect their targeted sales of the Novel, Film, and related infringing works in the State of Illinois to have consequences in the State of Illinois. Further, each of the Defendants has acted in a manner that qualifies in at least one of the following categories of activity over which this Court can assert personal jurisdiction under Fed. R. Civ. P. 4(k) and 735 ILCS § 5/2-209(a)(2): (a) wrongfully caused Plaintiff substantial injury through the exploitation of the Novel, Film, and related infringing works in the State of Illinois; (b) derived substantial revenue from Illinois residents through the exploitation of the Novel, Film, and related infringing works; (c) entered into negotiations and transactions with an Illinois resident in relation to the Novel, Film, and related infringing works; (d) facilitated the making of contracts or promises with an Illinois resident in relation to the Novel, Film, and related infringing works; or (e) collaborated with an Illinois resident in a manner that furthered the creation of the Novel, Film, and related infringing works through commission of tortious acts in Illinois.

4. Venue is proper in this district pursuant to 28 U.S.C. §§ 1400(a) and 1391(b)(3), (c), as Defendant Gillian Flynn resides in this district.

## Parties

5. Plaintiff Leslie Weller is an individual and resident of the State of Nevada.

6. Defendant Gillian Flynn ("Flynn") is an individual and resident of the State of Illinois in this district. Flynn is identified as the author of the Novel and the screenplay for the Film (the "Screenplay").

7. Defendant Penguin Random House LLC d/b/a Crown Publishing Group ("Penguin Random House") is a Delaware limited liability company with its principal place of business in New York, New York. Penguin Random House is the publisher of the Novel and the audiobook based on the Novel (the "Audiobook").

8. Defendant Bruna Papandrea is an individual and resident of Australia. She is one of the producers of the Film.

9. Defendant Laura Jeanne Reese Witherspoon ("Reese Witherspoon") is an individual and resident of the State of California. She is one of the producers of the Film.

10. Defendant Twentieth Century Fox Film Corporation ("Twentieth Century Fox") is a Delaware corporation with its principal place of business in Los Angeles, California. Defendant Twentieth Century Fox is authorized by the Illinois Secretary of State to transact business in Illinois. Defendant Twentieth Century Fox both produced and distributed the Film.

11. Defendant Leslie Dixon is an individual and resident of the State of California. She is one of the producers of the Film.

12. Defendant David Fincher ("Fincher") is an individual and resident of the State of California. He is the director of the Film.

### Plaintiff Registered Her Work with the U.S. Copyright Office

13. Plaintiff is the sole author of the original screenplay entitled *Out of the Blue*.

14. Plaintiff first filed a registration of *Out of the Blue* with the U.S. Copyright Office on February 1, 2006. The U.S. Copyright Office issued Registration Number TXu001283974 for this work.

15. After revising the initially registered version of *Out of the Blue*, Plaintiff again filed a registration of *Out of the Blue* with the U.S. Copyright Office on August 20, 2007. The U.S. Copyright Office issued Registration Number TXu001569246 for this work.

**16.** After making additional revisions to the version registered in 2007, Plaintiff again filed a registration of *Out of the Blue*, or alternatively *OTB3*, with the U.S. Copyright Office on July 8, 2008. The U.S. Copyright Office issued Registration Number PAu003350973 for *OTB3*.

### Reported History of the Novel and Its Adaptation into the Film

**17.** Defendant Flynn lost her job at *Entertainment Weekly* in December 2008.[1]

**18.** In March 2009, while awaiting publication of Flynn's second novel, *Dark Places*, Defendant Penguin Random House's predecessor-in-interest, Random House, Inc., asked Defendant Flynn to write another book.[2]

**19.** Defendant Flynn received an advance of $150,000 to write the Novel – significantly more than she had received for either of her previous novels – with her publisher hoping that the Novel "would do a little better than the first two."[3]

**20.** Defendant Flynn wrote the Novel while she was living in Chicago, Illinois over the course of almost three years.[4]

**21.** In December 2011, prior to the Novel's publication, Defendant Leslie Dixon obtained a copy of the Novel's manuscript and forwarded it to Defendant Reese Witherspoon, who, together with her then-business partner Defendant Bruna Papandrea, was actively seeking female-driven content to produce.[5]

---

[1] Steve Paul, *Kansas City Native Gillian Flynn Emerges as a Literary Force with Her Twisted Mystery 'Gone Girl'*, Kan. City Star (Nov. 11, 2012), http://www.kansascity.com/living/star-magazine/article2485406.html (last visited Feb. 8, 2018).

[2] *Id.*

[3] Louise Carpenter, *Gillian Flynn on Gone Girl: 'People Don't Understand It's Just Fiction'*, The Telegraph (Sept. 27, 2014), http://www.telegraph.co.uk/culture/film/starsandstories/11122159/Gillian-Flynn-on-Gone-Girl-People-dont-understand-its-just-fiction.html (last visited Feb. 8, 2018).

[4] Laurie Grassi, *Q&A with Gillian Flynn, Author of Gone Girl, Chatelaine Book Club Pick of the Month*, CHATELAINE.COM (Dec. 7, 2012), http://www.chatelaine.com/living/chatelaine-book-club/qa-with-gillian-flynn-author-of-gone-girl-chatelaine-book-club-pick-of-the-month/ (last visited Feb. 8, 2018).

[5] Jenelle Riley, *Reese Witherspoon, Bruna Papandrea Push for Female-Driven Material with Pacific Standard*, VARIETY (Oct. 7, 2014), http://variety.com/2014/film/features/reese-witherspoon-production-company-female-driven-material-1201323117/ (last visited Feb. 8, 2018); *"Gone Girl" Oct. 3rd*, THE HIGHLAND TIMES (Sept.

22. Between December 2011 and the Novel's publication, Defendants Witherspoon, Papandrea, and Dixon sought studio support for the production of the Novel's film adaptation.[6]

23. Crown Publishing Group (formerly a division of Random House, Inc. and now a part of Defendant Penguin Random House) first published the Novel in June 2012.

24. In July 2012, Defendants Witherspoon, Papandrea, and Dixon succeeded in brokering Defendant Twentieth Century Fox's acquisition of film rights to the Novel and hiring Defendant Flynn to write the Screenplay.[7]

25. By the time that Defendant Flynn delivered her first draft of the Screenplay to Twentieth Century Fox, Defendant Fincher had signed on to direct the Film. Defendants Flynn and Fincher then proceeded to collaborate to refine the Screenplay, with Flynn comparing Fincher to a "really good editor."[8]

26. The Film was initially released on or around October 3, 2014.

27. Defendant Flynn still resides in Chicago, Illinois and has been domiciled in Chicago, Illinois at all relevant times.[9]

### Defendants Had a Reasonable Opportunity to Copy Plaintiff's Work

28. On May 19, 2008, Plaintiff emailed a copy of *OTB3* to script consultant and story analyst Pilar Alessandra ("Alessandra"), who teaches and lectures world-wide, in preparation for a screenwriting consultation meeting with Alessandra.

---

29, 2014), http://thehighlandtimes.com/entertainments/2014/09/29/gone-girl-oct-3rd/ (last visited Feb. 8, 2018).

[6] *"Gone Girl" Oct. 3rd*, THE HIGHLAND TIMES (Sept. 29, 2014), http://thehighlandtimes.com/entertainments/2014/09/29/gone-girl-oct-3rd/ (last visited Feb. 8, 2018).
[7] Mike Fleming Jr., *Comic-Con: Fox, Reese Witherspoon at Center of 7-Figure Deal for Gillian Flynn Novel 'Gone Girl'*, Deadline Hollywood (July 12, 2012), http://deadline.com/2012/07/comic-con-fox-reese-witherspoon-at-center-of-7-figure-deal-for-gillian-flynn-novel-gone-girl-299313/ (last visited Feb. 8, 2018).
[8] Gina McIntyre, *Thrills, Chills for Gillian Flynn in Adapting 'Gone Girl'*, L.A. Times (Sept. 5, 2014), http://www.latimes.com/entertainment/la-et-mn-ca-sneaks-gone-girl-20140907-story.html (last visited Feb. 8, 2018). Flynn and Fincher have continued their collaborations even after the Film. *Id.*
[9] *See id.*; Lili Anolik, *Inside the Dangerous Mind of Gone Girl's Gillian Flynn*, Elle (Oct. 10, 2014), http://www.elle.com/culture/movies-tv/a14563/inside-gone-girls-gillian-flynn/ (last visited Feb. 8, 2018).

**29.** In addition to providing script consulting services, Alessandra is an internationally-known podcaster, author of screenwriting books, and screenwriting instructor who has trained writers for ABC/Disney and CBS. Alessandra has numerous connections in the publishing, film, and other entertainment-related industries.

**30.** On May 21, 2008, Plaintiff met in person with Alessandra for a consultation regarding *OTB3*. At the end of this consultation, Alessandra expressed that the screenplay would probably win an award and then insisted on retaining a hard copy of *OTB3*, in spite of Plaintiff's three requests and attempts to retrieve the hard copy of *OTB3* from Alessandra. Plaintiff relented and permitted Alessandra to keep the hard copy of *OTB3*.

**31.** Alessandra was a contributor to *Now Write! Screenwriting: Screenwriting Exercises from Today's Best Writers and Teachers* (ISBN-13: 9781585428519) ("*Now Write! Screenwriting*"), which was part of the book series *Now Write!*, published between 2006 and 2011 by Tarcher/Perigee (formerly Tarcher/Penguin and now a division of Defendant Penguin Random House).

**32.** The primary editor of the *Now Write!* series (including of *Now Write! Screenwriting*) was Sherry Ellis ("Ellis"). Ellis died in 2011.

**33.** *Now Write! Screenwriting*, on which both Alessandra and Ellis collaborated, was copyrighted in 2010 and published on or around January 6, 2011.

**34.** In an episode of Alessandra's *On The Page* podcast published on or around June 5, 2015, Alessandra interviewed Ellis' niece and co-editor of *Now Write! Screenwriting*, Laurie Lamson ("Lamson"). In the podcast, Alessandra estimates that she and Lamson began corresponding "about five years ago" when Alessandra contributed to *Now Write! Screenwriting*.

**35.** In the introductory note to *Now Write! Screenwriting*, "A Note from Sherry Ellis and Laurie Lamson," Ellis and Lamson state they began discussing their collaboration on *Now Write! Screenwriting* in 2008.

36. The Levine Greenberg Literary Agency, Inc. ("Levine Greenberg") features Ellis on its website as one of the authors it represents, linking to Ellis' biography page on the *Now Write!* website.

37. In the "How We Work" section of its website, Levine Greenberg states that it offers services that include editorial development and writer collaboration.

38. Levine Greenberg further markets its editorial development services as follows:

   a. "**Concept development**: we help you figure out the format and approach for translating your expertise, skill, or talent into a marketable work."

   b. "**Proposal development**: we guide you through the process of creating a proposal and sample material for effective presentation of your work."

   c. "**Editorial review**: we are available to you throughout the writing process. In this capacity, we work in an adjunct role with the editor at your publishing house."

39. Levine Greenberg further markets its writer collaboration services as follows:

   a. "**Matchmaking**: we identify writers who by background and interest will be able to work effectively with our clients."

   b. "**Guidance**: we guide experts and writers through all aspects of the collaborative process. We provide a sample contract and assistance with proposal development."

40. According to archived captures of Levine Greenberg's website from 2008 and 2009, in the "History" portion of its website, Levine Greenberg marketed that its "co-agents in Hollywood handle movie and television rights with major studios and production companies."[10]

41. In the first edition of the Novel, Defendant Flynn begins the acknowledgments section as follows: "I've got to start with Stephanie Kip Rostan, whose smart advice, sound opinions, and

---

[10] *Levine Greenberg Literary Agency :: History*, INTERNET ARCHIVE WAYBACK MACHINE (Feb. 4, 2009), https://web.archive.org/web/20081219192637/http://www.levinegreenberg.com:80/html/history.html (last visited Feb. 8, 2018).

good humor have seen me through three books now. . . Thanks for all the excellent guidance over the years.  Many thanks also to Jim Levine and Daniel Greenberg and everyone at Levine Greenberg Literary Agency."[11]

42. Stephanie Kip Rostan is Defendant Flynn's literary agent and is a named partner at Levine Greenberg (which now styles itself as "Levine | Greenberg | Rostan").

43. Before the Novel was published and after Plaintiff provided Alessandra with electronic and hardcopy versions of *OTB3*, Alessandra collaborated with Ellis – a client of Levine Greenberg, who at the same time was representing Defendant Flynn.

44. Per Defendant Flynn's own statements in the acknowledgment section of the Novel, as well as Levine Greenberg's own marketing materials, Levine Greenberg played an active and significant role during the writing of the Novel.  Upon information and belief, Levine Greenberg further followed through on statements in its marketing materials by providing editorial development services and writer collaboration services to Defendant Flynn during the writing of the Novel.

45. Further, according to archived captures of Defendant Flynn's website, as of July 11, 2011, Levine Greenberg represented her as literary agents, while Creative Artists Agency ("CAA") represented Defendant Flynn with respect to film rights.

46. Upon information and belief, Alessandra was acquainted with and had professional relationships with CAA representatives prior to Defendant Flynn's completion of the Novel.

47. Upon information and belief, prior to the completion of the Novel, through her agents, Defendant Flynn gained access to or, at a minimum, had a reasonable opportunity to copy either (i) a copy of *OTB3* that Plaintiff had provided to Alessandra or (ii) an unauthorized derivative version stemming therefrom.

---

[11] Flynn, Gillian, GONE GIRL 417 (1st ed. 2012).

48. Defendants subsequently adapted the Novel to create other derivative works, including, without limitation, the Audiobook and the Film. Defendant Flynn was hired to create the Screenplay based on the Novel, and the Screenplay was used to create the Film which was directed by Defendant Fincher and produced by Defendants Bruna Papandrea, Reese Witherspoon, Leslie Dixon, and Twentieth Century Fox. All Defendants involved in the creation of the Film had access to *OTB3*'s original creative elements by accessing them through the Novel or the Screenplay.

**Striking, Substantial, and Numerous Similarities Between *OTB3* and the Defendants' Works**

49. *OTB3* and the Novel contain striking and substantial similarities in terms of their (i) premise and plot, (ii) structure, (iii) scene content, (iv) character biographies, arcs, and psychological composition, and (v) idiosyncratic authorial choice (including stand-alone details, scene sequencing, and recurrent themes).

50. All derivative works of the Novel, including, without limitation, the Film, contain striking and substantial similarities to *OTB3* by incorporating many original creative elements that were contained in *OTB3* and copied into the Novel.

**Striking and Substantial Similarities in Premise and Plot**

51. *OTB3* and the Novel both focus on a married couple's relationship. From the reader's perspective, the wife has been injured or has potentially died in an unexpected incident. The reader learns of the couple's life together that led up to the incident. The husband and wife seem to be slowly drifting apart. The husband's dismissiveness and apparent hostility toward his wife start to seem potentially lethal. Later in the plot, the reader learns that the wife was purportedly pregnant at the time of the incident. This comes as a shock to the reader and one of the leads.

52. Both *OTB3* and the Novel contain a key twist: As more information about the husband emerges, the likelihood of the husband's guilt increases until it is revealed at the midpoint that the husband was innocent. The wife is not the nice, normal, and somewhat naïve housewife who was portrayed in the first half of the work and is, in fact, a psychopath. She wanted her husband dead, so she set up the incident that made it appear to the reader that the husband was responsible for hurting his wife. When this discovery is made, everything the reader knew about the story and the two lead characters comes into question, and the reader realizes that conversations, statements, and attitude were not always what they had seemed. When the husband discovers who the female lead really is, he expresses a desire to kill her.

53. Both *OTB3* and the Novel contain another key twist, embodied by a scene in the second half of each of the works to show the female lead's attitude change toward the male lead. She comes to believe they are a perfect match for each other. When he presents a less-tame nature, the female lead starts to admire this aspect of the male lead's personality. She seeks to reunite with the man whom she tried to kill and whom she had also hated for being dismissive and nasty toward her.

54. Both *OTB3* and the Novel contain another key twist: In response to discovering the female lead's true nature, the male lead cannot see himself being with a regular, normal woman, and seeks to reestablish his relationship with the woman who tried to kill him.

55. Both OTB3 and the Novel contain another key twist: The male and female leads seek to reunite and become a family again with their child. The female lead directly expresses her desire to "start over."

56. *OTB3* and the Novel both feature the female lead using her ex-boyfriend in an attempt to get her married life back, with the female lead further planning a murder toward that end. The male lead, in turn, is willing to cover for her.

### *Striking and Substantial Similarities in Structure*

57. Both *OTB3* and the Novel feature the primary plot twist that, after a buildup of suspicion toward the male lead to make the reader believe he tried to kill his wife, the reader learns that the female lead deliberately planned the incident. In the first half of each work, the story is structured to: (i) paint the female lead as acquiescent with her husband's dismissive and rude behavior and complacent in her marriage; (ii) portray the male lead as a massive jerk who appears to have lethal intent toward his wife; and (iii) take advantage of society's (and readers') preconceived notions that being a dismissive, jerk husband are the qualities of a criminal, while being an acquiescent, complacent wife indicates innocent victimhood.

58. Both *OTB3* and the Novel structure the story in an unusual manner in that it draws the reader to: (i) sympathize with the female lead at the beginning; (ii) gradually start to dislike and then despise the male lead throughout the first half; (iii) fear and dislike the female lead at the midpoint; (iv) sympathize with the male lead briefly after the midpoint; and (v) despise both lead characters for the remainder of the second half.

### *Striking and Substantial Similarities in Scene Content*

59. *OTB3* and the Novel both contain a scene to show the husband's dismissiveness toward his wife by having the husband find a home without consulting his wife. The reader discovers in another scene that the purchased house is not what the wife had wanted. The wife detests and mocks the house.

60. As part of setting up the illusion that the husband is a dismissive jerk, *OTB3* and the Novel both contain a scene in which the couple are arguing and the husband: (i) enters the kitchen; (ii) "tosses" something; (iii) gets an alcoholic drink; (iv) raises his glass at his wife in a dismissive gesture; and (v) walks drunkenly. In the same scene, after the husband "tosses" an object, something is "tossed" again.

61. Both *OTB3* and the Novel contain a scene in which the male lead leaves his wife without notice and goes to a strip club.

62. Both *OTB3* and the Novel contain a scene in which the male lead and his friends convey that they do not believe they have to keep wives informed of their whereabouts, and that they are free to do as they please.

63. To show the male lead almost getting caught in an affair, both *OTB3* and the Novel show that: (i) the male lead and his lover are in a compromising position with the woman's dress being at least partially removed and the woman wanting sex; (ii) the woman tries to remove the male lead's clothes while he expresses reticence; (iii) another person who does not know of the affair is in a nearby bathroom with the sound of water running; (iv) the male lead hurries his lover toward the door to have her leave before they are caught, while the female counterpart is much less anxious; (v) the unknowing other person in the bathroom is about to exit the bathroom and catch the lovers; and (vi) the male lead hurries his lover out the door just as the person in the bathroom enters the room.

64. Both *OTB3* and the Novel contain a scene in which the female lead is out in the rain and not welcome into the home. The scene ends on a closed front door. The function of the scene is to show the female lead is an outsider to a family unit.

65. Both OTB3 and the Novel contain a scene in which the male lead suspiciously and unexpectedly suggests that the couple go to a place that is described in various scenes as a "beach." In both works, the scene conveys the male lead's potentially lethal intent.

66. Both *OTB3* and the Novel contain a scene in which the male lead: (i) comes home and goes into the bedroom; (ii) finds his wife wet from a shower; (iii) pushes his wife against a wall; and (iv) has his way with her sexually. The scene is used to show the husband as using his wife to satisfy his own selfish desire.

*Striking and Substantial Similarities in Lead Character Biographies*

67. In both *OTB3* and the Novel, the female lead, *inter alia*: (i) appears nice, naïve, normal, and seeking a stable, typical married life; (ii) is always careful and planned about what she wants; (iii) has been previously asked by her ex-boyfriend to marry her but makes it clear that she never wanted to settle; (iv) does not like the home her husband selects without consulting her; (v) appears bored with her married life; (vi) appears to go along with her husband's desire to go out without her and without consulting her, but is secretly angered by his behavior; (vii) appears to be no longer having much sex with her husband, (viii) grows unsure of her husband's love for her and needs his reassurance; (ix) appears to have been deliberately harmed by her husband; (x) is shown later to have been evidently pregnant at the time of the apparent foul play; (xi) takes out a life insurance policy that the reader has been misled was the husband's idea; (xii) is revealed at the midpoint as being nothing like the individual she first appeared to be, but rather a psychopath; (xiii) is revealed as the dominant player in all of her relationships and the one who is pulling all the strings; (xiv) feels that she is not going anywhere in life; (xv) tries to kill her ex-husband as revenge for his being obnoxious to her; (xvi) shows disdain for her ex-boyfriend whom she feels she can easily manipulate to do her bidding due to the ex-boyfriend's desire and fondness for her; (xvii) enjoys having sex in a daring place, after which it causes her to become lackadaisical and hungry for food; (xviii) discovers the male lead was also not the same type of person as he had initially appeared, and is much more of a jerk when he becomes more physically aggressive, but she oddly likes that she has to be more careful around him; (xix) wants to get back her life with the male lead and child; (xx) tries to use her ex-boyfriend to cover for her; (xxi) is willing to kill to get her old life back; and (xxii) makes statements in the first half of the story that are misleading and not always what they seem.

**68.** In both *OTB3* and the Novel, the male lead, *inter alia*: (i) is cocky and has well-to-do a frat boy appearance; (ii) has been with a lot of women and is popular with women in a sexual way; (iii) boldly and overtly claims the female lead as his property; (iv) is disdainful and a bully toward the underdog; (v) is suspicious of the female lead's ex-boyfriend; (vi) is loquacious and verbally compatible with the female lead when they meet and when they talk to show how easily they click; (vii) makes a little joke that amuses the female lead at the beginning of their courtship, the subject of which becomes a running joke for the couple; (viii) is portrayed as someone who is underemployed but wants to make his own success; (ix) does not appear to aspire to wealth, which is later made suspect when he is painted as materialistic and interested in capitalizing on his wife's life insurance policy; (x) goes out on his own without asking his wife and believes that he does not have any obligation to ask her for permission or to even tell her; (xi) is often found watching or staring at his wife to make the reader believe that he is revealing formerly hidden and darker aspects of his character; (xii) appears to be growing dangerous; (xiii) suddenly acts in a loving manner, which creates a suspicion that he is planning something nefarious against his wife; (xiv) suggests the couple go to a beach where he then acts in a way that insinuates he may try to harm his wife there and then; (xv) is cold to and dismissive of his wife; (xvi) does something that makes it appear that he has direct lethal intent toward his wife, yet his action also appears to have been accidental; (xvii) is flippant about the harm that appears to have been inflicted upon the female lead; (xviii) has an extramarital affair; (xix) is revealed as having a different character aspect by suddenly using a pejorative term toward the female lead; (xx) is almost caught fooling around with another woman while someone is in the nearby bathroom; (xxi) pushes his wife against the wall and has his way with her; (xxii) learns the female lead tried to kill him, at which point he starts consistently using pejorative terms toward her and expresses that he wants to kill her; (xxiii) starts becoming interested and amused by the psychotic side of

the female lead; (xxiv) does not find the other women in his life as interesting after realizing the truth about the female lead; and (xxv) is willing to cover for the female lead's murderous actions, even after she tried to kill him and after she is willing to kill another person to reunite with him.

69. In both *OTB3* and the Novel, the female lead is an only child, the male lead has one sibling, and the male lead's sibling is portrayed as the family outcast in the parents' eyes, while the male lead is portrayed as the one whom parents favored.

### Striking and Substantial Similarities in Idiosyncratic Authorial Choices

70. *OTB3* and the Novel both contain dialogue between the male lead and his sibling, in which the sibling suggests that the couple are not a good fit. The sibling further suggests that the male lead likes his wife only because the wife fits the male lead's fantasy of how life should be.

71. Both *OTB3* and the Novel open with a visual of the female lead's head, followed by a question of how well one person can really know another person.

72. As the primary setting, *OTB3* and the Novel both feature a town that has a 1950s-era quality and that lies near a body of water.

73. Shortly before the male lead and the female lead marry, both *OTB3* and the Novel show the less well-off mother's negative attitude toward the impending marriage by having her: (i) use her own bad marriage as a warning; and (ii) avoid using the name of the soon-to-be spouse.

74. Both *OTB3* and the Novel have instances in which a hammer is introduced in a manner that appears ominous as to what the male lead might intend against the female lead.

75. To show the male lead's dismissiveness toward his wife, both *OTB3* and the Novel feature multiple instances of the male lead's going out without asking his wife, including once on a special occasion, because he does not feel that he needs her permission. The female lead acquiesces to this behavior, even though she is not happy about it.

76. Both *OTB3* and the Novel feature the appearance of an unexpected gift, which creates suspicion and discomfort for one of the leads. The scene involves: (i) a ginger approach to the gift; (ii) an implication that the gift contains a body part or a body, and (iii) the presence of a note on the gift that serves as a clue.

77. In both *OTB3* and the Novel, the reader discovers that the female lead was purportedly pregnant at the time of her apparent injury. This revelation occurs in a scene in which there is (i) focus on a brain-stunned reaction; and (ii) an auditory trigger from the character's point of view to emphasize the shock to both the character and the reader.

### Additional Shared Content

78. Both *OTB3* and the Novel open with a question of how well one person can really know another person, which is the story's central theme.

79. Without limitation, *OTB3* and the Novel also contain the following similarities:

    a. A cut to 7+ years in the future;

    b. The lead characters come from diverging backgrounds with respect to wealth: one lead's parents are wealthy, closely aligned, and pretentious, while the other lead has a slightly underclass single parent;

    c. A scene of the two leads painting their home and then filling the home with their belongings to portray a domestic picture to the reader;

    d. A scene to convey attitude of the wealthier mother toward the female lead, in which the wealthier mother makes a cutting remark about how the female lead has waited a long time to get married;

    e. After the midpoint, the story alternates between the two leads;

    f. The female lead's ex-boyfriend continues to maintain contact with her, even after she is married; and

     **g.** A scene to make the reader believe that the female lead's amorous and sexually inappropriate ex-boyfriend may have caused the incident that makes it appear that she has been harmed or is dead.

80. Without limitation, additional supporting characters in *OTB3* and the characters in the Novel may be compared as follows:

     **a.** Male lead's sibling:

        **i.** Is the outcast in the family;

        **ii.** Deliberately does things to antagonize a parent;

        **iii.** Tells brother/male lead that the brother/male lead's new wife is not his type and that the brother/male lead is fooling himself about what he wants in a wife; and

        **iv.** Tells brother/male lead that he is all about appearances and is trying to convince others that he is someone who the brother/male lead really is not.

     **b.** Female lead's ex-boyfriend:

        **i.** Appears to still be in love with the female lead;

        **ii.** Previously asked the female lead to marry him;

        **iii.** Later in the story, suggests to the female lead that they could still get back together;

        **iv.** Purports to know the female lead better than her husband;

        **v.** Is viewed by the female lead as someone she has wrapped around her finger and can use whenever she wants;

        **vi.** Acts in a sexually inappropriate manner toward the female lead and has hung around her in a seemingly creepy manner;

        **vii.** Serves as a potential suspect who may have caused harm to the female lead; and

        **viii.**   Serves to tell the female lead that she should not return to the male lead because the male lead has treated her badly.

   **c.**  Male lead's "other woman":

        **i.**   Is agreeable and simple;

        **ii.**   Is the sympathetic ear to the male lead's complaints about the female lead and that he no longer loves the female lead; and

       **iii.**   Is considered by the male lead to be too simple for him in comparison to the psychotic female lead, whom the male lead is beginning to find more interesting than this normal, unchallenging type of woman.

   **d.**  Wealthy parents:

        **i.**   Make child believe that child needs to live up to their standards and not to disappoint them;

        **ii.**   Purchase child's home; and

       **iii.**   Offer money to their child.

**81.** As set forth above, the Novel nakedly appropriates plot points, scene structure, themes, catharsis, visuals, character traits, character backstories, dialogical conclusions, and psychological impacts from *OTB3*. These story elements are interwoven in that they create (i) the nature of the characters, (ii) whom the characters present themselves to be to the reader, (iii) who the characters actually are, (iv) what actions the characters take, and (v) how supporting characters relate to them. These aspects are further interwoven within the numerous scenes, statements, plot points, and multi-layered twists to create the spine of the story within both *OTB3* and the Novel.

### The Film Contains Striking and Substantial Similarities to *OTB3*

82. After adaptation of the Novel into the Screenplay and, subsequently, the Film, the Film contains many of the same striking and substantial similarities to *OTB3* as set forth herein.

### Defendants Improperly Appropriated the Total Concept and Feel of *OTB3*

83. The following is a nonexclusive sampling of excerpts from professional editorial reviews of the Novel:

    **a.** In a review published on June 3, 2012, *USA Today*'s Carol Memmott wrote, "Gillian Flynn . . . delves this time into what happens when two people marry and one spouse has no idea who their beloved really is."[12]

    **b.** In a review published on May 29, 2012, *New York Times*' Janet Maslin wrote, "It is wily, mercurial, subtly layered and populated by characters so well imagined that they're hard to part with."[13]

    **c.** In a review published on June 6, 2012, *Entertainment Weekly*'s Jeff Giles wrote, "The first half of *Gone Girl* is a nimble caustic riff on . . . the way in which 'The butler did it' has morphed into 'The husband did it.' The second half is the real stunner though. Even as Gone Girl grows truly twisted and wild, it says smart things about how tenuous power relations are between men and women, and how often couples are at the mercy of forces beyond their control. As if that weren't enough, Flynn has created a genuinely creepy villain you don't see coming. People love to talk about the banality of evil. You're about to meet a maniac you could fall in love with."[14]

---

[12] Carol Memmott, *In 'Gone Girl' by Gillian Flynn, readers find gripping tale*, USA TODAY (June 3, 2012), https://www.usatoday.com/story/life/books/2013/06/28/in-gone-girl-readers-find-gripping-tale/2470493/ (last visited Feb. 8, 2018).
[13] Janet Maslin, *The Lies That Buoy, Then Break a Marriage*, N.Y. TIMES (May 29, 2012), http://www.nytimes.com/2012/05/30/books/gone-girl-by-gillian-flynn.html (last visited Feb. 8, 2018).
[14] Jeff Giles, *Gone Girl review – Gillian Flynn*, ENT. WKLY. (June 6, 2012), http://ew.com/article/2012/06/06/gone-girl-review-gillian-flynn/ (last visited Feb. 8, 2018).

**d.** *People* is quoted on Defendant Penguin Random House's website as stating, "An irresistible summer thriller with a twisting plot worthy of Alfred Hitchcock. Burrowing deep into the murkiest corners of the human psyche."[15]

**e.** Oline Cogdill of the *South Florida Sun-Sentinel* is quoted on Defendant Penguin Random House's website as stating, "That adage of no one knows what goes on behind closed doors moves the plot of Gone Girl, Gillian Flynn's suspenseful psychological thriller . . . Flynn's unpredictable plot of Gone Girl careens down an emotional highway where this couple dissects their marriage with sharp acumen."[16]

**f.** The *New York Times* is quoted on Defendant Penguin Random House's website as stating, "Readers who prefer more virulent strains of unreality will appreciate the sneaky mind games of Gillian Flynn's Gone Girl, a thriller rooted in the portrait of a tricky and troubled marriage."[17]

**g.** *Vogue.com* is quoted on Defendant Penguin Random House's website as stating about the Novel, "Masterfully plotted."[18]

**h.** *New York Times* bestselling author Kate Atkinson is quoted on Defendant Penguin Random House's website as stating about the Novel, "The plot has it all."[19]

**i.** The *St. Louis Post-Dispatch* is quoted on Defendant Penguin Random House's website as stating about the Novel, "A great story gives a reader a problem and leads you along a

---

[15] *Gone Girl by Gillian Flynn*, PENGUIN RANDOM HOUSE, https://www.penguinrandomhouse.com/books/196906/gone-girl-by-gillian-flynn/9780307588371/ (last visited Feb. 8, 2018).
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] *Id.*

path, then dumps you off a cliff and into a jungle of plot twists, character revelations and back stories that you could not have imagined. *Gone Girl* does just that."[20]

   **j.** The *New York Daily News* is quoted on Defendant Penguin Random House's website as stating about the Novel, "[Flynn has] quite outdone herself with a tale of marital strife so deliciously devious that it moves the finish line on *The War of the Roses* . . . A novel studded with disclosures and guided by purposeful misdirection . . ."[21]

**84.** The following is a nonexclusive sampling of excerpts from reviews from ordinary readers of the Novel, which reviews were posted in various formats on websites such as Amazon.com, YouTube.com, and GoodReads.com:

   **a.** On January 28, 2014, Amazon user Tabby1249 wrote, "What makes Gone Girl so frightening is the deep dive the reader takes into the mind of a sociopath and the extent to which she planned and executed her particular brand of terrifying retribution. It is also a study of what happens when two people who are profoundly wrong for one another marry."

   **b.** On January 31, 2015, Amazon user vanillacoke wrote, "The characters, though – they're so perfectly, realistically awful. I dare you to find me another book with a female character whose life is centered on 'domestic' marriage/home themes but is this . . . I actually can't find the words for this situation. It's so good, so rare that that theme is so well-done, so multi-dimensional."

   **c.** On April 6, 2014, Amazon user J.D. Rummel wrote, "As I read it I was about half way through and wondering what the fuss was about . . . but I was kind of creeping through

---

[20] *Id.*
[21] *Id.*

it, rating it as just a middle of the road mystery.  Then I hit the half-way point and she upended the table on me."

**d.** On August 24, 2012, Amazon user Robert Landry wrote: "Just as I was waiting for it to wrap up, the second half starts and I'm stunned by the next plot twist.  I can't even imagine how Gillian Flynn came up with this story, and I'm stunned at how much insight she has into the human psyche."

**e.** On February 20, 2015, Amazon user View from the hills wrote, "[The female lead] is the angry wife who mirrors herself to be what she thinks others want and a husband who wields his good looks and charm as a weapon . . . I found myself changing allegiance between the two major characters . . . so many times until I finally woke up to the idea that both these narcissistic people deserved each other!!"

**f.** On August 23, 2012, GoodReads user Tarryn Fisher wrote, "Intricate characters.  Plot twists that blow away all other plot twists."

**g.** On June 17, 2012, GoodReads user Connie (Ava Catherine) wrote, "This book begins in a straightforward manner . . . the husband is the main suspect.  However, people and events are not as they seem.  I could never have imagined this plot line, which made it all the more delicious to read."

**h.** In a video published on May 11, 2013, YouTube user candysomething states, "biggest selling point is a massive plot twist."[22]

**i.** In a video published on February 24, 2014, YouTube user getbookish states, "You can see their marriage doesn't seem to be that great . . . . There's a whole other layer of stuff

---

[22] Candysomething, *'Gone Girl' – Gillian Flynn | Review*, YOUTUBE (May 11, 2013), https://www.youtube.com/watch?v=1aCGKf-wlDY (last visited Feb. 8, 2018).

going on that you don't realize. This book takes a very wild turn. When you get to the second section, my mind was blown . . . . That reveal, it's going to blow your mind."[23]

    **j.** In a video published on November 7, 2014, YouTube user thebookbasement states, "There are so many twists in the plot . . . . This is not a book you ever want to be spoiled for . . . . the sign of a good plot. . . . This book is the most duplicitous book I have ever read."[24]

    **k.** In a video published on October 4, 2014, YouTube user NumptyParis states, "Obviously, Gillian Flynn is trying to make you feel a certain way about [the leads] from the start, up to about the mid-way point. And it worked. I detested Nick. Everything he did, I just end up hating him more and more and more. He was so suspicious and so shifty and I just couldn't not believe that he had not done it . . . . And obviously there is the twist in the middle."[25]

**85.** Both professional and non-professional reviewers viewed the Novel's value and originality as being directly tied to the plot (including the plot twists), the structure, and the lead characters' traits and psychology. All of these elements were originally contained in *OTB3* and appear in strikingly similar and substantially similar form in the Novel (as well as the Audiobook, the Screenplay, and the Film).

**86.** The Novel and Film have garnered praise and have attained financial success because of original elements contained in *OTB3*. These original elements were improperly appropriated from *OTB3*.

---

[23] Getbookish, *Book Review: Gone Girl*, YOUTUBE (Feb. 24, 2014), https://www.youtube.com/watch?v=td_C4ty0Nuk (last visited Feb. 8, 2018).
[24] Thebookbasement, *BOOK REVIEW: GONE GIRL BY GILLIAN FLYNN*, YOUTUBE (Nov. 7, 2014), https://www.youtube.com/watch?v=URc3u4zxin4 (last visited Feb. 8, 2018).
[25] NumptyParis, *Book Review | Gone Girl (SPOILERS)*, YOUTUBE (Oct. 4, 2014), https://www.youtube.com/watch?v=4p-ZUxx-9TQ (last visited Feb. 8, 2018).

**87.** The Novel is an unauthorized derivative work of *OTB3*.

**88.** In addition to sharing many of the striking and substantial similarities between *OTB3* and the Novel, the Audiobook, the Screenplay, and the Film are undisputedly derivative and adapted works of the Novel, which itself is an unauthorized derivative and adapted work of *OTB3*.

### Success of the Infringing Works

**89.** The initial publication of the Novel in the U.S. was on or about June 2012. The Novel was #1 on the New York Times Hardcover Fiction Bestseller list for 37 weeks and otherwise on the list for over 130 weeks. Defendant Flynn's website boasts that there are more than 15 million copies of the Novel in print worldwide.[26]

**90.** The initial publication of the Audiobook was on or about June 2012. The Audiobook is available on Audible, Amazon.com, Audiobooks.com, YouTube, Spotify, Audiobooks.net, BarnesandNoble.com, iTunes, Google Play, and AudioBookStore.com.

**91.** The initial theatrical release of the Film in the U.S. was on or about September 26, 2014. The domestic and foreign theatrical box office receipts for the Film are approximately $369 million.

**92.** The initial DVD and Blu-Ray release date of the Film was on or about January 13, 2015. It has also been released in countries around the world, including Japan, South Africa, India, China, Russia, and many other countries. It has been estimated that receipts of DVD and Blu-Ray sales of the Film are approximately $25 million.[27]

**93.** Blu-ray and DVD copies of the Film have been and continue to be for sale at Amazon.com, Best Buy, and other retail outlets.

**94.** Blu-ray and DVD copies of the Novel have been and continue to be available for subscription rental through Netflix and RedBox.

---

[26] http://gillian-flynn.com/, last visited Feb. 8, 2018.
[27] Gone Girl (2014), available at http://www.the-numbers.com/movie/Gone-Girl#tab=video-sales, last visited Feb. 8, 2018.

95. Copies of the Film have been and continue to be available for purchase, without limitation, on Amazon Video, iTunes, Google Play, YouTube, Vudu, Microsoft, Playstation Video, DirecTV Cinema, Fandango Now, Comcast Xfinity, and other digital channels.

96. The Film has been and continues to be broadcast on cable television, including HBO and FX Movie Channel, in the United States.  It has also been broadcast on television in the United Kingdom, Australia, and numerous other countries.

97. The Film has been and continues to be publicly performed on airlines, including Delta, one of the largest airlines in the world.

98. Portions of OTB3 have been and continue to be publicly performed at the official website for the Film, https://www.foxmovies.com/movies/gone-girl.

**Count I - Direct Copyright Infringement against Defendants Flynn, Fincher, Penguin Random House, and Twentieth Century Fox**

99. Plaintiff repeats and re-alleges paragraphs 1 through 98 as though fully set forth herein.

100. *OTB3* is an original work of authorship and is fixed in a tangible medium of expression.

101. Plaintiff is the owner and proprietor of all right, title, and interest in and to the dramatic work titled *OTB3*, which was timely registered with the U.S. Copyright Office, Number PAu003350973.

102. Plaintiff has never granted Defendants Flynn, Fincher, Penguin Random House, and Twentieth Century Fox the authorization to copy, record, publish, perform, or make derivative works of Plaintiff's work *OTB3*.

103. Defendant Flynn had a reasonable opportunity to copy *OTB3*.

104. Defendant Fincher had a reasonable opportunity to copy *OTB3*, namely, through accessing the *OTB3*-derivative work Screenplay from which Defendant Fincher directed the Film.

105.     Defendant Penguin Random House had a reasonable opportunity to copy OTB3, namely, through accessing the Novel.

106.     Defendant Twentieth Century Fox had a reasonable opportunity to copy OTB3, namely, through accessing the OTB-derivative work Screenplay and OTB3-derivative work Film that Defendant Twentieth Century Fox distributed.

107.     Defendant Flynn has copied substantial portions of Plaintiff's work and incorporated them into the Novel, the Audiobook, and the Screenplay, and by doing so has infringed Plaintiff's copyright.

108.     Defendant Fincher has copied substantial portions of Plaintiff's work and incorporated them into the Film he directed, and by doing so has infringed Plaintiff's copyright.

109.     Defendant Penguin Random House copied substantial portions of Plaintiff's work and incorporated them into the Novel and Audiobook, both of which Defendant Penguin Random House published and distributed, and by doing so has infringed Plaintiff's copyright.

110.     Defendant Twentieth Century Fox copied substantial portions of Plaintiff's work and incorporated them into the Film that Defendant Twentieth Century Fox distributed, and by doing so has infringed Plaintiff's copyright.

111. Beginning in 2012, Defendants Flynn, Fincher, Penguin Random House, and Twentieth Century Fox have reproduced, distributed, published, and publicly performed infringing versions of OTB3 and have continued to do so to the present time.

112.     All of these acts violate Plaintiff's exclusive rights under Section 106 of the Copyright Act and constitute infringement of her copyright.

113.     By their actions described herein, Defendants Flynn, Fincher, Penguin Random House, and Twentieth Century Fox have damaged Plaintiff in an amount to be determined at trial and have

unjustly enriched Defendants Flynn, Fincher, Penguin Random House, and Twentieth Century Fox in an amount to be determined at trial.

### Count II - Vicarious Copyright Infringement Against Defendants Penguin Random House, Bruna Papandrea, Reese Witherspoon, Leslie Dixon, and Twentieth Century Fox

**114.** Plaintiff repeats and re-alleges paragraphs 1 through 113 as though fully set forth herein.

**115.** At all relevant times, Defendant Penguin Random House, as the publisher and distributor of the Novel and Audiobook, had the right and ability to supervise, control, or stop the infringing conduct described herein as it occurred over the course of Defendant Flynn's writing and subsequent publishing and distribution of the Novel, and the recording, publishing, and distribution of the Audiobook.

**116.** At all relevant times, Defendants Bruna Papandrea, Reese Witherspoon, Leslie Dixon, and Twentieth Century Fox, as producers and distributors of the Film, had the right and ability to supervise, control, or stop the infringing conduct described herein as it occurred over the course of the production and distribution of the Film.

**117.** Defendant Penguin Random House had and continues to have a direct financial interest in, and profit from, the infringing conduct described herein in the form of sales and licensing of the Novel and Audiobook.

**118.** Defendants Bruna Papandrea, Reese Witherspoon, Leslie Dixon, and Twentieth Century Fox had and continue to have a direct financial interest in, and profit from, the infringing conduct described herein in the form of sales and licensing of the Film.

**119.** All of these acts violate Plaintiff's exclusive rights under Section 106 of the Copyright Act and constitute infringement of her copyright.

**120.** By their actions described herein, Defendants Penguin Random House, Bruna Papandrea, Reese Witherspoon, Leslie Dixon, and Twentieth Century Fox have damaged Plaintiff in an

amount to be determined at trial and have unjustly enriched Defendants in an amount to be determined at trial.

**WHEREFORE**, Plaintiff prays for judgment against Defendants as follows:

**A.** Declaring that Defendants' unauthorized conduct violates Plaintiff's rights under 17 U.S.C. § 106;

**B.** Permanently enjoining Defendants and their agents, employees, and affiliated companies from infringing Plaintiff's copyright and, specifically, enjoining them from reproducing, selling, distributing, publicly performing, or making derivative works of Plaintiff's copyrighted dramatic work;

**C.** Ordering the impoundment or destruction of all copies of the infringing work in the possession or control of any of the Defendants or their agents, employees, and affiliated companies, pursuant to 17 U.S.C. § 503(b);

**D.** Awarding Plaintiff such actual damages as she has sustained as a result of Defendants' copyright infringement in an amount to be determined at trial, pursuant to 17 U.S.C. § 504(b);

**E.** Ordering Defendants to account for and disgorge to Plaintiff all gains, profits, and advantages derived by their copyright infringement, pursuant to 17 U.S.C. § 504(b);

**F.** Awarding Plaintiff her costs, reasonable attorneys' fees, and disbursements in this action, pursuant to 17 U.S.C. § 505;

**G.** Awarding Plaintiff pre- and post-judgment interest on any monetary recovery; and

**H.** Granting such other and further relief as the Court deems just and appropriate.

## Jury Demand

Pursuant to Fed. R. Civ. P. 38(b), the Plaintiff demands a jury trial.

Respectfully Submitted,

/s/Adam E. Urbanczyk
By: Adam E. Urbanczyk
Ziliak Law LLC
141 W. Jackson Blvd. Suite 4048
Chicago, IL 60604
adamu@ziliak.com
(312) 462-3350
ARDC: No. 6301067
*Attorney for Plaintiff Leslie Weller*