**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLIE WELLER**, | ) | |
| | ) | Case No. 1:17-cv-08799 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. John Robert Blakey |
| | ) | |
| **GILLIAN FLYNN, PENGUIN RANDOM** | ) | |
| **HOUSE LLC d/b/a CROWN PUBLISHING** | ) | |
| **GROUP, BRUNA PAPANDREA, LAURA** | ) | |
| **JEANNE REESE WITHERSPOON, LESLIE** | ) | |
| **DIXON, TWENTIETH CENTURY FOX** | ) | |
| **FILM CORPORATION, AND DAVID** | ) | |
| **FINCHER**, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF MOTION OF DEFENDANTS**
**TWENTIETH CENTURY FOX FILM CORPORATION, BRUNA PAPANDREA,**
**LAURA JEANNE REESE WITHERSPOON, AND DAVID FINCHER**
**TO DISMISS PLAINTIFF'S FIRST AMENDED COMPLAINT**

## TABLE OF CONTENTS

I.  INTRODUCTION ........................................................................................................1

II.  THE WORKS AT ISSUE ..........................................................................................2

    A.  Summary of *Out of the Blue* .............................................................................2

    B.  Summary of *Gone Girl* .......................................................................................4

III.  PLAINTIFF'S COPYRIGHT CLAIM MUST BE DISMISSED WITH PREJUDICE. ...........6

    A.  The FAC Does Not Plausibly Allege Access. ....................................................6

    B.  The Works Are Not Substantially Similar, Let Alone Strikingly Similar. .........8

        1.  The Similarities Alleged Are Non-Existent or Legally Irrelevant.............13

        2.  The Expressive Elements of *OTB* and *Gone Girl* Are Completely Different.............15

            a.   Plot & Sequence of Events ...................................................................15

            b.   Theme .....................................................................................................16

            c.   Characters ..............................................................................................17

            d.   Setting / Mood / Pace ...........................................................................19

IV.  PLAINTIFF'S SECOND CAUSE OF ACTION FOR VICARIOUS COPYRIGHT INFRINGEMENT MUST BE DISMISSED WITH PREJUDICE.........................................20

V.  CONCLUSION........................................................................................................20

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Allen v. Scholastic Inc.*,
 739 F. Supp. 2d 642 (S.D.N.Y. 2011) ...............................................................................12, 13

*Berkic v. Crichton*,
 761 F.2d 1289 (9th Cir. 1985) .........................................................................................10

*Bernal v. Paradigm Talent & Literary Agency*,
 788 F. Supp. 2d 1043 (C.D. Cal. 2010) ..............................................................................7

*Brownmark Films, LLC v. Comedy Partners*,
 682 F.3d 687 (7th Cir. 2012) ...........................................................................................2

*Bucklew v. Hawkins, Ash, Baptie & Co., LLP*,
 329 F.3d 923 (7th Cir. 2003) ..........................................................................................10

*Design Basics, LLC v. Lexington Homes, Inc.*,
 858 F.3d 1093 (7th Cir. 2017) ..........................................................................................8

*DiTocco v. Riordan*,
 815 F. Supp. 2d 655 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012).....................12

*Frerck v. John Wiley & Sons, Inc.*,
 No. 11-CV-2727, 2014 WL 3512991 (N.D. Ill. July 14, 2014)..............................................20

*Funky Films, Inc. v. Time Warner Entm't Co., L.P.*,
 462 F.3d 1072 (9th Cir. 2006) ..........................................................................................11

*Hecker v. Deere*,
 556 F.3d 575 (7th Cir. 2009) .............................................................................................8

*Herzog v. Castle Rock Entm't*,
 193 F.3d 1241 (11th Cir. 1999) .....................................................................................11, 12

*Hobbs v. John*,
 722 F.3d 1089 (7th Cir. 2013) ....................................................................................8, 9, 10

*Incredible Techs., Inc. v. Virtual Techs., Inc.*,
 400 F.3d 1007 (7th Cir. 2005) ........................................................................................8, 9

*O'Leary v. Books*,
   No. 08-CV-08, 2008 WL 3889867 (N.D. Ill. Aug. 18, 2008) ................................................11

*Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*,
   975 F. Supp. 2d 920 (N.D. Ill. 2013) ........................................................................................9

*Peter F. Gaito Architecture, LLC v. Simone Dev. Corp.*,
   602 F.3d 57 (2d Cir. 2010) ........................................................................................................8

*Peters v. West*,
   692 F.3d 629 (7th Cir. 2012) ......................................................................................6, 8, 9, 10

*Selle v. Gibbs*,
   741 F.2d 896 (7th Cir. 1984) .............................................................................................6, 7, 13

*Sheldon Abend Revocable Tr. v. Spielberg*,
   748 F. Supp. 2d 200 (S.D.N.Y. 2010) ....................................................................................13

*Silas v. Home Box Office, Inc.*,
   201 F. Supp. 3d 1158 (C.D. Cal. 2016), *aff'd sub nom.*, No. 16-56215,
   2018 WL 1018332 (9th Cir. Feb. 22, 2018) ...........................................................................12

*Theotokatos v. Sara Lee Pers. Prod.*,
   971 F. Supp. 332 (N.D. Ill. 1997) .............................................................................................8

*Tillman v. New Line Cinema Corp.*,
   295 F. App'x 840 (7th Cir. 2008) ............................................................................................10

*Towler v. Sayles*,
   76 F.3d 579 (4th Cir. 1996) .......................................................................................................7

*Warner Bros. Inc. v. Am. Broad. Cos.*,
   720 F.2d 231 (2d Cir. 1983) ....................................................................................................10

*Williams v. Crichton*,
   84 F.3d 581 (2d Cir. 1996) .................................................................................................10, 13

**STATUTES**

17 U.S.C. § 102(b) .........................................................................................................................9

**OTHER AUTHORITIES**

4 Nimmer on Copyright § 13.03[B][2] ...........................................................................................9

GOLDSTEIN ON COPYRIGHT § 2.3.1 (3d ed. 2017) ...........................................................................9

Defendants Twentieth Century Fox Film Corp., Bruna Papandrea, Laura Jean Reese Witherspoon, and David Fincher (the "Fox Defendants") respectfully submit this Memorandum of Law in support of their Motion to Dismiss Plaintiff Leslie Weller's First Amended Complaint ("FAC") with prejudice, pursuant to Federal Rule of Civil Procedure 12(b)(6).

## I.  INTRODUCTION

Plaintiff's claims fail because she does not allege that her script, *Out of the Blue* ("*OTB*"), was sent to any of the defendants, but instead hypothesizes that it found its way to *Gone Girl* author Gillian Flynn through a conjectured path of people and organizations in which her script would have changed hands at least five times.  Mere speculation that Weller's script could have been delivered to Flynn through this unlikely chain of acquaintances is not a plausible allegation of access.  Without plausible facts of access, Plaintiff must show such striking similarities between the works so as to preclude any inference other than copying.  She cannot do so.

Plaintiff's infringement claims additionally fail for the independent reason that *Gone Girl* and *OTB* barely share any of the same ideas—let alone protectable expression—and therefore are not substantially similar, much less strikingly similar, as a matter of law.  *Gone Girl* is part psychological, Hitchcockian crime story and part satire of modern America's obsession with sensationally televised crime stories in the vein of Scott and Laci Peterson.  *Gone Girl* is set in motion when the witty, intelligent, outwardly perfect Amy Dunne—the inspiration for her parents' beloved children's book series "Amazing Amy"—disappears under mysterious circumstances, placing her unsympathetic husband Nick in the crosshairs of a police investigation and a national media circus.  Through an innovative storytelling device, the history of Nick and Amy's relationship is presented in a series of flashbacks that are later revealed to be the product of a fictitious diary she painstakingly manufactured to frame Nick for her equally fictitious murder.  In truth, Nick is the real victim, and Amy is a cold, calculating psychopath.

In stark contrast, *OTB* is a formulaic, soap-opera style story about multiple lovers who turn against each other, chaotically alternating between scenes of sex and violence. *OTB*'s female lead, Mary, miraculously awakens from a seven-year coma—with her memory intact—to find she has given birth during the coma to a child being raised by her now ex-husband with his new wife. This triggers rage in Mary and sets in motion a cast of thinly-drawn characters who zigzag—sometimes inexplicably—in and out of murderous alliances and sexual relationships resulting in the deaths of Mary and her ex-husband. Whereas *Gone Girl* is tightly-plotted and centered on the revelation that Amy is—and always has been—a calculating psychopath, *OTB*'s haphazard plot packs in a soap opera season's worth of twists and turns, right up until the out-of-left-field revelation on the final page that a secondary character was the hidden mastermind responsible for the deadly mayhem.

Even a cursory comparison of *Gone Girl* and *OTB* reveals that the works are so profoundly different that it is difficult to understand this copyright action as anything other than another "baseless shakedown[]" in an attempt to force an unjustified settlement. *See Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 691 (7th Cir. 2012). Plaintiff's meritless claims should be dismissed as a matter of law.[1]

## II.     THE WORKS AT ISSUE

### A.     Summary of *Out of the Blue*

*OTB*'s topsy-turvy plot follows the exploits of five central characters: Mary Ellis, an innocent-seeming bride later revealed to be a sex-crazed villainess; Steve Ellis, Mary's husband

---

[1] Claim I of Plaintiff's FAC alleges direct copyright infringement by Defendants Gillian Flynn, David Fincher, Twentieth Century Fox Film Corp., and Penguin Random House. Claim II of Plaintiff's FAC alleges vicarious copyright infringement by Defendants Bruna Papandrea, Laura Jeanne Reese Witherspoon, Leslie Dixon, Twentieth Century Fox Film Corp., and Penguin Random House. As explained further herein, Plaintiff's claim for vicarious infringement must fail because she cannot establish the necessary element of direct copyright infringement. *See* § IV, *infra*.

and later ex-husband, who ricochets between being the target of Mary's murderous plotting, to being her co-conspirator in a plan to murder his new wife, Eileen; Carl, Mary's longtime flame with a hidden secret; and Mark, Steve's estranged brother who is gay.

*OTB* begins with the brief courtship and marriage of Steve and Mary Ellis. The couple's initial domestic bliss soon turns to restlessness. One night—while driving on a mountainside road with a drunk Steve napping in the back seat—Mary swerves to avoid a boulder, driving their car off a cliff. Mary is next shown waking from a coma (with her speech and memory intact) a full seven years after the car accident. She learns she was pregnant at the time of the accident, and that Steve is now raising the child with his new wife, Eileen. In another reveal, it turns out Mary and Carl had planned the accident to kill Steve in a botched attempt to cash in on his life insurance policy. In yet another twist, Carl could be the father of Mary's child.

Still angry at Steve's abandonment and taking of her child, Mary begins stalking Steve—slashing his tires, side-swiping him with her car, and finally hiding out in his hunting cabin where she attacks him with a knife. In the story's most bizarre twist, their life-or-death struggle somehow turns into intense sex. When Mary reveals she plotted the car accident to kill Steve, he is only further aroused by their newfound chemistry. The two soon begin making illicit plans to get rid of Eileen so they can raise their child together, but in a later scene it appears that Mary gets cold feet and breaks things off with Steve.

*OTB*'s climactic final sequence occurs at Steve's hunting cabin and features even more chaotic plot twists, violent confrontations, and deaths of the lead characters. Mary—who, it turns out, actually *is* in cahoots with Steve—tries to shoot Eileen while she is on a hike, but Eileen escapes. Mary chases Eileen and tries to kill her again, nearly shooting Steve in the process. Then, Steve is suddenly killed by Carl. Mary tries to shoot Carl, but Carl escapes into

the woods. Eileen then reappears, and Mary chases her to the cabin where they have a brutal fight, at the end of which Eileen shoots Mary dead. The next scene opens on Carl, who is placing flowers at the spot where Mary drove off the cliff years ago. He then gets into his car where—in another inexplicable plot twist—Mark, Steve's brother, is waiting. At this point, the viewer recalls an earlier scene where Mark told Eileen he had a gay lover when he was in the military, and they were caught and discharged. Carl was Mark's lover, and they have been together for years. All this mayhem was engineered by Mark and Carl who believe Steve was responsible for outing them.

### B.     Summary of *Gone Girl*

*Gone Girl* centers on the failing marriage of aspiring novelist Nick Dunne and his witty, beautiful, well-educated wife Amy Elliott. After losing their writing jobs, Nick and Amy move from New York City to suburban Missouri to care for Nick's dying mother. On the day of Nick and Amy's fifth anniversary, Nick returns home to find Amy is missing. Her disappearance receives national media attention, as Amy was the inspiration for her parents' popular children's book series "Amazing Amy." Detective duo Rhonda Boney and Jim Gilpin do a walkthrough of Nick and Amy's home and find poorly concealed evidence of a struggle and remnants of cleaned blood stains, leading to the conclusion that Amy was badly injured or murdered.

As the local community and Nick's wealthy in-laws organize search parties and candlelight vigils for Amy, suspicions arise that Nick is responsible for Amy's disappearance. Nick is followed by crowds of television cameras and his every word and facial expression are dissected by news commentators. Along with his twin sister and best friend Margo, who loyally supports him throughout the film, Nick tries to solve the mystery of his wife's disappearance by following a series of clues left by Amy, which at first appear to be part of her anniversary present to Nick, but which are in fact part of Amy's meticulous plan to frame Nick for her murder.

As the present-day events unfold, Nick and Amy's backstory is revealed in flashbacks narrated by Amy. Their relationship seems perfect at first, but their conjugal happiness is interrupted by the 2008 financial crisis and Nick's mother's cancer diagnosis. After moving to Missouri, Amy depletes her trust fund buying a house and a bar for Nick to run following his mother's death. In later flashbacks, Nick is cast in an increasingly dark light and is ultimately physically violent toward Amy. Amy attempts to buy a gun for protection against Nick. Meanwhile, the present-day storyline is peppered with signs that Nick may be hiding something. He furtively dodges calls from an unknown caller who is later revealed to be his twenty-something mistress. Public suspicions of Nick reach a fever pitch when Noelle Hawthorne—a neighbor and Amy's friend—reveals that Amy was six-weeks pregnant when she disappeared.

At the film's midpoint—when suspicions of Nick have reached a crescendo—the story's central twist is revealed. Amy is shown, alive and well, driving down a highway while she says in voiceover, "I am so much happier now that I am dead." (1:06:00.) As it turns out, Amy is not dead, but rather has laid a meticulous trap to frame her "lazy, lying, cheating" husband for murder. (1:06:30.) Amy narrates the steps of her elaborate plan: befriending "local idiot" Noelle and telling her lies about Nick's abuse and her pregnancy; having Nick increase her life insurance policy; siphoning her own blood to stage the crime scene; and manufacturing a fake diary with "300 entries" to be discovered by the police. Amy is not the passive "perfect" wife depicted earlier in the film, but rather a calculating, cold-blooded psychopath.

Once Amy's trap becomes clear, Nick retains TV-ready and famous defense attorney, Tanner Bolt, who leads Nick to an ex-boyfriend of Amy's whom she framed for rape. Meanwhile, Amy avidly consumes the news coverage of Nick while hiding out at a motel. After two guests swindle Amy out of her remaining cash, Amy desperately pivots her plan, calling her

ex-boyfriend Desi Collings, who takes her to his secluded lake house. Amy is soon reminded of Desi's controlling nature and—after seeing Nick's nationally-televised apology for his affair—she hatches a plan to frame Desi for her kidnapping and return to Nick and the media spotlight she craves. Amy slashes Desi's throat during sex because a dead patsy is the best patsy.

Amy is next seen reuniting with Nick on the stoop of their Missouri home while still drenched in Desi's blood, dramatically falling into his arms in front of a crowd of ever-present reporters. After giving the police a crafted explanation of her supposed kidnapping and escape from Desi, Amy returns home with Nick where she reveals that she has impregnated herself with Nick's child via Nick's previous deposit at a sperm bank. Nick despises Amy, but reluctantly stays with Amy—whom he now fears—to raise their child. The film closes with Nick trapped as Amy's "loving husband" as they announce Amy's new pregnancy in a television interview.

## III.  PLAINTIFF'S COPYRIGHT CLAIM MUST BE DISMISSED WITH PREJUDICE.

Where, as here, a plaintiff does not allege facts that directly establish the defendant copied from her work, the plaintiff must allege facts sufficient to show that (1) the defendant had a reasonable opportunity to copy the work ("*access*"), and (2) the works at issue are *substantially similar* in their protectable expression. *Peters v. West*, 692 F.3d 629, 633 (7th Cir. 2012). Where there are insufficient facts to establish access, the claim can survive only if access can be inferred from *striking similarities* between the works—that is, similarities that are "so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Selle v. Gibbs*, 741 F.2d 896, 901 (7th Cir. 1984).

### A.  The FAC Does Not Plausibly Allege Access.

Establishing that copying actually took place is "crucial to any claim of copyright infringement because no matter how similar the two works may be (even to the point of identity),

6

if the defendant did not copy the accused work, there is no infringement." *Selle*, 741 F.2d at 901. Access cannot be based on speculation and conjecture. Rather, there must be "more than a bare possibility that the defendants could have had access to" the plaintiff's work. *Id.* at 903.

Here, the FAC does not allege that *Gone Girl* author Gillian Flynn or any close associate was ever sent a copy of *OTB*, or that Plaintiff's unproduced screenplay was widely disseminated. Instead, Plaintiff assembles a string of acquaintances through which Flynn *might have possibly* received Plaintiff's screenplay. Allegedly, Plaintiff once gave her script to screenwriting teacher Pilar Alessandra (FAC ¶¶ 28-29); Alessandra, on her podcast, interviewed Laurie Lamson, co-editor of a screenwriting textbook to which a number of screenwriters contributed, including Alessandra (*id.* ¶ 34); the *other* editor of that textbook was Sherry Ellis, who died in 2011 (*id.* ¶ 32); it appears Ellis was at one point represented by someone at The Levine Greenberg Literary Agency (*id.* ¶ 36); and Stephanie Rostan, a partner at Levine Greenberg, is the literary agent of Flynn, the author of *Gone Girl* (*id.* ¶ 42).

It is well-settled that a plaintiff cannot establish access by constructing a "tortuous chain of hypothetical transmittals." *Towler v. Sayles*, 76 F.3d 579, 583 (4th Cir. 1996); *see also Bernal v. Paradigm Talent & Literary Agency*, 788 F. Supp. 2d 1043, 1057-59 (C.D. Cal. 2010) (that two agents worked at the same literary agency only "raises the theoretical possibility" that they shared or discussed the plaintiff's work; this "pure speculation" does not establish access). Plaintiff theorizes transmittal of her script through a chain of five acquaintances, one of whom died six years ago. This tortuous hypothetical chain cannot support a finding of access.

Accordingly, Plaintiff's claim must be dismissed on the basis of lack of access alone unless, as an alternative, she can show such striking similarities between the works so as to preclude any inference other than copying. *See Gibbs*, 741 F.2d at 901. For the same reasons

outlined in § III.B, *infra*, she cannot do so.

### B. The Works Are Not Substantially Similar, Let Alone Strikingly Similar.

Even if Plaintiff could establish access—and she cannot—her claim would still fail for

the independent reason that *Gone Girl* and *OTB* are not substantially similar as a matter of law.

In addressing substantial similarity on a Rule 12(b)(6) motion, a court must review the works at

issue and, if that review reveals the works are not substantially similar in protectable expression,

the court should dismiss the copyright claim with prejudice. *See Hobbs v. John*, 722 F.3d 1089,

1094-95 (7th Cir. 2013) (affirming dismissal based on lack of substantial similarity at the

pleading stage); *Peters*, 692 F.3d at 630 (same). Courts are fully-equipped to assess substantial

similarity on a motion to dismiss because "no discovery or fact-finding is typically necessary . . .

. [W]hat is required is only a visual comparison of the works." *Peter F. Gaito Architecture,

LLC v. Simone Dev. Corp.*, 602 F.3d 57, 64 (2d Cir. 2010); *accord Hobbs*, 722 F.3d at 1094-95;

*Peters*, 692 F.3d at 630 (same). When comparing works at the pleading stage, "the works

themselves supersede and control any contrary allegations, conclusions or descriptions of the

works as contained in the pleadings." *Theotokatos v. Sara Lee Pers. Prod.*, 971 F. Supp. 332,

341 (N.D. Ill. 1997).[2]

To assess substantial similarity, courts must review the works and determine whether an

ordinary observer would believe that copying took place. *See Design Basics, LLC v. Lexington

Homes, Inc.*, 858 F.3d 1093, 1101 (7th Cir. 2017). However, "despite what the ordinary

observer might see, the copyright laws preclude appropriation of only those elements of the work

---

[2] Courts may consider documents that are integral to the allegations in the complaint, even if they are not attached as exhibits. *See Hecker v. Deere*, 556 F.3d 575, 582-83 (7th Cir. 2009). Accordingly, Fox has submitted to the Court a deposit copy of *OTB* from the Copyright Office (Registration No. Pau 3-350-973) and a DVD of the *Gone Girl* film. (*See* Dkt. No. 41, Exs. A-B); *see also Hobbs*, 722 F.3d at 1091 ("'[D]ocuments attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim.'").

that are protected by the copyright." *Incredible Techs., Inc. v. Virtual Techs., Inc.*, 400 F.3d 1007, 1011 (7th Cir. 2005); *see also Peters*, 692 F.3d at 632 ("If the copied parts are not, on their own, protectable expression, then there can be no claim for infringement of the reproduction right."). Thus, when assessing substantial similarity, "unprotectable, elements of the work in question, even those that 'are most significant and most clearly similar,' are not taken into account." *Pers. Keepsakes, Inc. v. Personalizationmall.com, Inc.*, 975 F. Supp. 2d 920, 927 (N.D. Ill. 2013).

To determine which aspects of the works at issue are protectable and unprotectable, courts are guided by certain fundamental principles of copyright law. First and foremost, it is axiomatic that the Copyright Act does not protect general ideas, but only "the particular expression of an idea." *Hobbs*, 722 F.3d at 1094; *see generally* 17 U.S.C. § 102(b) ("In no case does copyright protection for an original work of authorship extend to any idea."). Distinguishing unprotected ideas from protected expression is critical to ensuring that no author can improperly gain a monopoly over the facts, clichés, stock settings and characters, and other conventions of storytelling that are the building blocks of many literary works. As the Nimmer treatise observes, "[t]he policy rationale underlying the Act's exclusion of ideas from copyright protection is clear: To grant property status to a mere idea would permit withdrawing the idea from the stock of materials open to other authors, thereby narrowing the field of thought open for development and exploitation." 4 Nimmer on Copyright § 13.03[B][2].[3]

---

[3] Likewise, Stanford Professor Paul Goldstein explains in his treatise that "copyright does not attach to the building blocks of creative expression." GOLDSTEIN ON COPYRIGHT § 2.3.1 (3d ed. 2017). These "unprotectable building blocks" typically include a work's "theme, plot, stock characters and settings . . . ." *Id.* Giving one creator a legal monopoly over basic story ideas, scenes, or characters would thwart the fundamental objective of copyright law by preventing other creators from elaborating on these standard elements in their own creative ways in the production of their own works. *See id.* § 1.14.2 ("Copyright law withholds protection from ideas on the premise that the national culture would languish if creators had to pay tribute each time they employed one of these building blocks.").

Accordingly, it is a fundamental principle of copyright law that "[n]o one can own the basic idea for a story." *Berkic v. Crichton*, 761 F.2d 1289, 1293 (9th Cir. 1985); *see, e.g.*, *Bucklew v. Hawkins, Ash, Baptie & Co., LLP*, 329 F.3d 923, 929 (7th Cir. 2003) (explaining that no one could claim that the movie *You've Got Mail* infringes the movie *The Shop Around the Corner*, even though in both, the hero falls in love with the heroine based on correspondence without having met or realizing he knows (and dislikes) her). Likewise, copyright law does not protect "incidents, characters or settings which are as a practical matter indispensable, or at least standard, in the treatment of a given topic," otherwise known as *scenes à faire*. *Hobbs*, 722 F.3d at 109. Finally, differences between works must be considered because "numerous differences tend to undercut substantial similarity." *Warner Bros. Inc. v. Am. Broad. Cos.*, 720 F.2d 231, 241 (2d Cir. 1983).

Applying these principles, courts regularly find no substantial similarity as a matter of law where the similarities between two works are not similarities at the level of protectable expression. For example, in *Tillman v. New Line Cinema Corp.*, 295 F. App'x 840 (7th Cir. 2008), the court found that two screenplays were not substantially similar where both involved a father who commits crimes and ultimately plans his own suicide in order to save his terminally ill child. The court held that the similarities between the works—both of which involved "sick children, caring fathers, hospital nurses, a beeping heart monitor, the lack of health insurance, praying, crying, and expressions such as 'Don't Shoot!' and 'It's a miracle'"—are "generic similarities far removed from the realm of protected expression." *Id.* at 841.[4]

---

[4] While *Tillman* happens to have been decided on summary judgment, courts apply the same legal principles when assessing substantial similarity at the pleading stage. *See, e.g.*, *Hobbs v. John*, 2012 WL 5342321, at *3 (N.D. Ill. Oct. 29, 2012), *aff'd*, 722 F.3d 1089 (7th Cir. 2013) ("Because the test for substantial similarity is an objective test, district courts may determine copyright infringement claims at the motion to dismiss stage of litigation."); *Peters*, 692 F.3d at 630 (citing cases in the summary judgment context for legal principles applied in finding no substantial similarity as a matter of law at the pleading

Courts likewise find no infringement as a matter of law where the similarities between two works are accompanied by a number of differences. For example, in *Williams v. Crichton*, 84 F.3d 581 (2d Cir. 1996), the Second Circuit rejected plaintiff's claim that the film *Jurassic Park* infringed his books set in a dinosaur zoo, despite the fact that both works included characters who spend the night in the dinosaur zoo and escape from dangerous dinosaurs by helicopter through the combined wit of the children and adults. The court determined that "[w]hen one looks beyond the superficial similarities in the characters, many differences emerge, including the motivations for the characters' trip to the dinosaur parks, the skills and credentials of the characters, and their interpersonal relationships." *Id*; *see also Funky Films, Inc. v. Time Warner Entm't Co., L.P.*, 462 F.3d 1072 (9th Cir. 2006) (no substantial similarity as a matter of law between plaintiff's work and the television series *Six Feet Under* where both works involved a family-run funeral home, the death of the family patriarch, and the return of the "prodigal son" who assists his brother in maintaining the family business; holding that "an actual reading of the two works reveals greater, more significant differences and few real similarities at the levels of plot, characters, themes, mood, pace, dialogue, or sequence of events.").

Even where plaintiffs plead an extensive catalog of similarities between two works—far more extensive than Plaintiff pleads here—courts nonetheless find no substantial similarity as a matter of law where those similarities amount to trivialities, unprotected ideas, and *scenes à faire*. For example, in *Herzog v. Castle Rock Entertainment*, 193 F.3d 1241 (11th Cir. 1999), the Eleventh Circuit found no infringement where the plaintiff identified a long list of purported similarities between his screenplay and the film *Lone Star*, including that both works (i) use flashback sequences to shift from the present to the past; (ii) take place in rural, "redneck" towns

stage); *O'Leary v. Books*, No. 08 CV 08, 2008 WL 3889867, at *2 (N.D. Ill. Aug. 18, 2008) (same).

with histories of racial tension that are dominated by corrupt public officials; (iii) make reference to land obtained as a result of massacres; (iv) have powerful citizens who conspire to hide the truth of the murders until their secrets are uncovered by the film's protagonists; (v) use the device that deaths were due to foul play instead of natural causes; (vi) use the consequences of a prank to set in motion a chain of events and revelations central to the secrets of the town and its residents; (vii) recount the massacre of Indians via flashbacks of the witnesses; (viii) use a ring to identify the victims; (ix) use information obtained from elderly men at roadside stands to unravel the role of the father in the town's hidden past; (x) have protagonists who are second-generation sheriffs who return to their hometown and solve a murder; (xi) mention black Seminole Indians; (xii) have evil sheriffs who blackmail townspeople and are killed; (xiii) have prominent businesswomen who harbor secrets central to the plot; and (xiv) have old-timers who help solve the mysteries by telling the protagonists about the town's history.  *Id.* at 1257.  The Eleventh Circuit upheld the district court's finding that the works were not substantially similar as a matter of law, holding that any common elements in the works were "unprotectable ideas or *scenes a faire*" and that "the specific expressions are dissimilar."  *Id.*

These are only a few examples among hundreds of cases from across circuits in which courts have applied basic copyright principles to find no substantial similarity as a matter of law even where the works at issue included far more similar ideas than are present here.[5]

---

5 *See, e.g.*, *Silas v. Home Box Office, Inc.*, 201 F. Supp. 3d 1158 (C.D. Cal. 2016), *aff'd sub nom.*, No. 16-56215, 2018 WL 1018332 (9th Cir. Feb. 22, 2018) (determining on motion to dismiss that there was no substantial similarity between two television pilots, both of which focused on the lucrative business ventures of African-American NFL players who live in Miami); *DiTocco v. Riordan*, 815 F. Supp. 2d 655 (S.D.N.Y. 2011), *aff'd*, 496 F. App'x 126 (2d Cir. 2012) (determining on motion to dismiss that there was no substantial similarity between the plaintiff's "Percy John Allen" stories, about a modern American high school boy who learns that he is a descendent of the Greek god Perseus, and the defendants' "Percy Jackson" novels, about a modern American high school boy who learns his father was Poseidon); *Allen v. Scholastic Inc.*, 739 F. Supp. 2d 642 (S.D.N.Y. 2011) (determining on motion to dismiss that there was no substantial similarity between the plaintiff's novel and J.K. Rowling's *Harry Potter and the Goblet of*

Here, because Plaintiff utterly fails to allege any plausible access, her claim is subject to a heightened standard of similarity. Specifically, she must establish "striking similarity," which means similarity that "cannot satisfactorily be accounted for by a theory of coincidence, independent creation, prior common source, or any theory other than that of copying." *Selle*, 741 F.2d at 904. As discussed below, *Gone Girl* and *OTB* are so profoundly different that Plaintiff does not come remotely close to satisfying the standard for substantial similarity, let alone striking similarity. *See* §§ III.B.1 and III.B.2, *infra*.

### 1. The Similarities Alleged Are Non-Existent or Legally Irrelevant.

Plaintiff's FAC relies heavily on a list of alleged "similarities" between *Gone Girl* and *OTB*. (*See* FAC ¶¶ 49-82.) However, such lists of random purported similarities are legally irrelevant, as the Court's analysis must be based on the works themselves and not the plaintiff's characterizations of the works. *See* § III.B, *supra*; *see also Williams*, 84 F.3d at 590 (such lists "are inherently subjective and unreliable"); *Sheldon Abend Revocable Tr. v. Spielberg*, 748 F. Supp. 2d 200, 204 n.4 (S.D.N.Y. 2010) (observing that "lists or charts" of purported similarities are not relevant to a determination of substantial similarity); *Allen*, 739 F. Supp. 2d at 663 (finding unpersuasive "[plaintiff's] attempts to portray similarities by selectively extracting various trivialities from each book").

Here, Plaintiff repeatedly uses wordplay and mischaracterizations to make very different aspects of the works sound superficially similar. In some cases, Plaintiff alleges elements that can be made to sound similar only by abstracting them to a high level of generality. For example, Plaintiff alleges that in both works, "from the reader's perspective, the wife has been

---

*Fire* even though both featured "famous male wizards" who are initiated into wizarding in adolescence and "are chosen to compete in year-long wizard competitions," where the "competitions are scored out of a thousand units, are announced in the great hall of a castle, [and] involve the rescue of hostages").

injured or has potentially died in an unexpected accident." (FAC ¶ 51.) With this broad description, Plaintiff yokes together two entirely different expressions—Amy's apparent kidnapping and/or murder in *Gone Girl* which turns out to be a ruse, and the seven-year coma that Mary actually suffers after accidentally driving off of a cliff in *OTB*. Likewise, Plaintiff alleges that both works "open with a visual of the female lead's head." (*Id.* ¶ 71.) However, in *Gone Girl*, Nick is stroking the back of Amy's hair in a placid moment during better times in their relationship, whereas *OTB* begins with a close-up of Mary's blood-covered face just after she is in a violent car crash.

Elsewhere, Plaintiff relies on outright misstatements about the works: for example, alleging that Margo Dunne and Mark Ellis are both "family outcast[s]" when Margo is in fact not an "outcast" but rather Nick's loving and supportive twin. (FAC ¶ 80.) These are only a few of the numerous misleading descriptions that Plaintiff uses to make these fundamentally different works sound similar.

Any similarities that do exist between the works constitute unprotectable ideas, or *scenes à faire* flowing from those ideas, including: (i) the courtship and marriage of a young couple;[6] (ii) a character who is made to appear guilty or innocent when the opposite is true; and (iii) a murderous female. These generic ideas and stock plot devices—and the *scenes à faire* associated with each—are not legally protectable. The archetype of the murderous *femme fatale* is particularly well-trodden ground, dating back to classic film noir,[7] through more recent

---

[6] *E.g.*, Weller alleges that both works include a "male lead who makes a little joke that amuses the female lead at the beginning of their courtship" (FAC ¶ 68); and a recently-married couple "painting their home and then filling [it] with their belongings to portray a domestic picture to the reader" (*id.* ¶ 79).

[7] *E.g.*, *The Postman Always Rings Twice* (1947) (a wife plots with her lover to kill her husband for their financial gain, but plans go awry when the scheming wife suffers a serious car crash); *Niagara* (1953) (a wife plots with her lover to kill her husband to collect on his life insurance policy, but plans go awry when the lover is thrown over the edge of Niagara Falls).

14

cinema,[8] and—more recently—a plethora of television docudramas.[9]  And the idea of a potentially violent husband and a pregnant wife is likewise unprotectable—indeed, Gillian Flynn has said that her novel was inspired by the media coverage of the real-life story of Scott Peterson, an attractive, wealthy husband convicted of murdering his pregnant wife Laci.[10]  And the plot device in which an innocent character at first appears guilty, or vice versa, is likewise unprotectable—it is a mainstay in crime fiction appearing, for example, in nearly every episode of the *Law & Order* television franchise, in the films of Alfred Hitchcock,[11] and in dramatic works dating back to Shakespeare and Greek tragedians.

### 2. The Expressive Elements of *OTB* and *Gone Girl* Are Completely Different.

A review of the works conclusively establishes as a matter of law that there is no substantial similarity between the protectable elements of *Gone Girl* and *OTB*.

#### a. Plot & Sequence of Events

As the above descriptions of the two works make clear, the plot and sequence of events in each are almost nothing alike.  *See* § II, *supra*.  *Gone Girl* is perhaps best known for its unique narrative structure.  The story's first half is presented out of sequence, with the present-day events inter-spliced with apparent flashbacks of Nick and Amy's relationship that slowly reveal Nick's violent side.  At the film's midpoint, it is revealed that these darker diary entries were fictitious—Amy, an unreliable narrator, created them as evidence to frame Nick.  *OTB*'s structure is nothing like *Gone Girl*'s: *OTB* is presented chronologically throughout and there is

---

[8] *E.g.*, *Body Heat* (1981) (a wife plots with her lover to kill her husband to inherit his wealth, but plans go awry when—in the film's second half—it is revealed that the wife had been secretly plotting to dupe her lover the entire time); *see also Fatal Attraction* (1987), *Black Widow* (1988), *Basic Instinct* (1992).

[9] *E.g.*, *Snapped* (docudrama series in its 22nd season on the *Oxygen* network about women accused of murdering their current or former husbands and/or lovers, frequently for revenge or insurance payouts).

[10] *See* "'Gone Girl' author Gillian Flynn talks murder, marriage, and con games," ENTERTAINMENT WEEKLY (June 26, 2012).

[11] *E.g.*, *Spellbound* (1945); *Strangers on a Train* (1951).

no plot device involving an unreliable narrator. Instead, the turning point in *OTB* is Mary's seven-year coma, during which numerous events occur that go unseen by the viewer. No similar plot device is used in *Gone Girl*.

The groundbreaking revelation that Amy is a psychopath at the midpoint of *Gone Girl* marks a turning point in the film, resolving the viewer's questions about whether Nick is guilty and making clear from that point forward that Amy is the villain and Nick is her victim. In contrast, the revelation that Mary conspired with Carl in attempting to murder Steve does not resolve the "whodunit" aspect of *OTB*'s plot. Instead, the true motivations of the story's central characters are kept hidden from the audience as Mary, Steve, Eileen, Carl, and Mark shift in their romantic entanglements and/or criminal alliances throughout the second half. An almost comical number of plot twists continue to occur, and red herrings are continually planted to toy with the viewer's expectations throughout. In the final scene it is soap operatically revealed that Carl and Mark are the screenplay's true masterminds, and have secretly been in a gay relationship.

Moreover, just as there is no seven-year coma or extended fight sequences in *Gone Girl*, there are numerous plot elements in *Gone Girl* that are completely absent in *OTB*, including: a community's search for a missing person; a main character at the center of a national media circus; a "treasure hunt" of clues left by one character for another; an investigation featuring two detectives who are central characters; a savvy lawyer managing a PR campaign to rehabilitate the image of a main character; a main character navigating a high-stakes television interview; an ex-boyfriend who is violently murdered by a main character to frame him for kidnapping; and a pregnancy in the final act that forces a main character to stay married to the wife he despises.

### b. Theme

*Gone Girl* is a complex, layered film that spans genres and operates on a number of thematic levels. It is at once a domestic drama, a gripping thriller, a police procedural, and a

satire of the institution of marriage and our country's obsession with tabloid crime coverage. The film also plays with themes of psychological manipulation and identity: reminding the viewer that just as individuals can both manipulate and be manipulated by the media (for example, by casting a public figure in a role that may be contrary to reality), the institution of marriage also manipulates individuals into roles that may be contrary to their authentic selves (*e.g.*, the cultural conditioning that tells a highly-educated and accomplished woman like Amy that she is expected to get married and become a mother to be complete).

On the other hand, to the extent a theme can be discerned from *OTB*'s twisting, chaotic plot, it involves the straightforward elements typically found in sexually-charged thrillers, such as revenge, obsession, and the lurid interplay between sex and violence. And whereas *OTB* employs the thematic element of heavy-handed symbolism,[12] *Gone Girl* does not.

### c. Characters

The supposedly corresponding characters that Plaintiff alleges to be similar are, in fact, profoundly different, and the works contain numerous characters for which there is no counterpart in the other work.

**Amy/Mary**. Amy (*Gone Girl*) is well-educated from a wealthy New York family and is well-known nationally due to her association with the "Amazing Amy" book series; Mary (*OTB*) was raised by a lower-class single mother and has no public identity. Amy is a cold, calculating, and emotionally antiseptic psychopath with a history of framing those closest to her, who singularly plots her husband's downfall. Mary, on the other hand, is an emotionally erratic, sex-charged basket case who repeatedly conspires with her lovers to commit murder but fails each

---

[12] *E.g.*, "Signs of rain" at the wedding bode poorly for the marriage (Dkt. No. 41, Ex. A at 8-9); the portentous sound of a hammer echoing in Steve and Mary's new home (*id.* at 11); two meteors falling that leave Mary feeling "suddenly troubled" (*id.* at 20).

time. Whereas Amy is disciplined and meticulous, Mary is impulsive and unstable. Amy never inflicts direct physical violence on Nick, but instead crafts an elaborate plan to cast him as a villain in front of a national audience. Amy's one act of physical violence in the film—killing Desi so that he can take the blame for her fake kidnapping—is performed with almost reptilian efficiency for pragmatic rather than emotional reasons. In contrast, the knife-wielding, rifle-toting Mary gets into multiple physically violent altercations with Steve and others.

In *Gone Girl*, Amy frames Nick because he relocated her to Missouri where he devolved into a lazy and inattentive husband, sapping Amy of her identity and purpose before ultimately cheating on her. Mary's motivations, on the other hand, constantly shift as she whiplashes between emotional extremes—she is first motivated to kill Steve to get an insurance payout and to be with Carl; next she is motivated by murderous revenge against Steve and Eileen for taking her child; and then she is motivated to kill Eileen both by her insatiable lust for Steve and her desire to raise her son with him. Whereas Amy hides her psychotic intentions behind a placid facade, Mary wears her thirst for vengeance on her sleeve.

**Nick/Steve**. Nick (*Gone Girl*) is from a middle-class family. Steve (*OTB*) comes from wealth. While Nick is a self-reflective writer, Steve has little emotional depth and his profession is not identified. When Nick first meets Amy, he is charming and witty; when Steve first meets Mary, he is drunk and uncooperative. Nick despises Amy after learning of her darker side, but stays with her out of sacrifice to his unborn child; in contrast, Steve becomes sexually obsessed with Mary after learning of her darker side. Whereas Steve is killed at the end of *OTB*, Nick ends up alive and under Amy's control in a domestic living hell at the end of *Gone Girl*.

**Margo/Mark**. Mark (*OTB*) is the black sheep of Steve's family, in large part because he is gay. Margo (*Gone Girl*), meanwhile, is a loving daughter who cared for her ailing mother, and

she is ostensibly heterosexual.  Mark and Steve openly and explicitly express hatred for one another, and Mark ultimately conspires with his gay lover Carl to kill Steve.  On the other hand, Margo is Nick's best friend, business partner, and most loyal supporter, and she and Nick openly express their love for one another (to the point they are accused of incest by the tabloid media).

**Desi/Carl**.  Desi (*Gone Girl*) is wealthy and pompous, whereas Carl (*OTB*) is blue collar.  In a final reveal, Carl (along with Mark) is shown to be the mastermind behind a long con to kill Steve and is one of the few main characters alive at the end of *OTB*.  Desi, on the other hand, ends up being a pawn in Amy's master plan and is the only character who dies in *Gone Girl*.

**Characters With No Counterpart**.  *Gone Girl* contains numerous characters for which there is no counterpart in *OTB*, including: Detectives Rhonda Boney and Jim Gilpin (lead investigators); Tanner Bolt (Nick's lawyer); Andie Fitzgerald (Nick's mistress); Tommy O'Hara (Amy's former victim); Noelle Hawthorne (Amy's neighbor and "friend"); Ellen Abbott, Sharon Schieber (journalists).  Likewise, numerous characters in *OTB* have no counterpart in *Gone Girl*: Eileen (Steve's second wife); little Steve (Mary's son); Ron and Eddy (two of Steve's old friends he encounters at a strip club).

### d.  Setting / Mood / Pace

*Gone Girl* is grounded in the post-recessionary period of the early-2010s.  The Missouri suburb where Nick and Amy share their oversized "McMansion"-style house is riddled with the after-effects of the financial crisis—shops are boarded up, and an abandoned mall is attracting homeless squatters.  The film's satirical treatment of the tabloid coverage of Amy's murder (including the Nancy Grace-like cable host Ellen Abbot) likewise grounds *Gone Girl* in our current media landscape.  *OTB*, on the other hand, is removed from any specific time period.

Moreover, the fact that Amy's disappearance is subject to police investigation and media scrutiny informs the immediate surroundings in *Gone Girl*—rooms in police stations, press

19

conferences, and media interviews in New York City. *OTB*, on the other hand, does not take place in the public eye; it is not even clear whether the crimes in *OTB* made the local news.

Additionally, *OTB* has the mood of a straightforward sexually-charged thriller—dark, sexually provocative, and constant building moments of tension, while *Gone Girl* mixes its dark suspenseful moments with dark humor, including wisecracking by Margo and the sardonic interactions of Detectives Gilpin and Boney.[13] Finally, while *OTB* is paced like a typical twisting, turning, loosely-plotted soap opera, *Gone Girl* has a more slowly unwinding pace with a major twist with unforeseen consequences like a Hitchcockian psychological thriller.

## IV. PLAINTIFF'S SECOND CAUSE OF ACTION FOR VICARIOUS COPYRIGHT INFRINGEMENT MUST BE DISMISSED WITH PREJUDICE.

In addition to her direct infringement claim, Plaintiff alleges that Bruna Papandrea, Laura Jeanne Reese Witherspoon, Leslie Dixon, Twentieth Century Fox Film Corporation, and Penguin Random House are liable for vicarious copyright infringement. To sustain a claim for vicarious infringement, a plaintiff must first establish that direct infringement occurred, and then must show (1) that defendants at all material times possessed the right and ability to supervise the infringing activity; and (2) that defendants have a direct financial interest in the infringer's activity. *See, e.g.*, *Frerck v. John Wiley & Sons, Inc.*, No. 11-CV-2727, 2014 WL 3512991, at *9 (N.D. Ill. July 14, 2014). Here, Plaintiff's vicarious infringement claim fails at the outset because she cannot establish direct infringement as a matter of law. *See* § III, *supra*.

## V. CONCLUSION

The Fox Defendants therefore respectfully request that the Court dismiss Plaintiff's FAC in its entirety with prejudice.

---

[13] Weller does not allege any copying of dialogue other than that at one point both Mary and Amy express a desire to "start over" in their marriage. (FAC ¶ 55.) This generic, time-worn phrase obviously cannot support a finding of infringement.

Dated:  March 1, 2018          Respectfully submitted,

TWENTIETH CENTURY FOX FILM
CORPORATION, BRUNA PAPANDREA,
LAURA JEANNE REESE WITHERSPOON &
DAVID FINCHER

By:        /s/ Richard L. Stone

JENNER & BLOCK LLP
Richard L. Stone (*pro hac vice*)
David R. Singer (*pro hac vice*)
Andrew G. Sullivan (*pro hac vice*)
633 West 5th Street
Suite 3600
Los Angeles, California 90071
Tel: (213) 239-2203
Fax: (213) 239-5199

Ashley M. Schumacher
Laura L. Norris
353 North Clark Street
Chicago, Illinois 60654
Tel: (312) 840-8672
Fax: (312) 840-7776

*Attorneys for Defendants Twentieth Century Fox*
*Film Corporation, Bruna Papandrea, Laura*
*Jeanne Reese Witherspoon and David Fincher*

**CERTIFICATE OF SERVICE**

Pursuant to Federal Rule of Civil Procedure 5 and Northern District of Illinois Local Rule 5.5, the undersigned, an attorney of record in this case, hereby certifies that on March 1, 2018, a true and correct copy of **Memorandum of Law in Support of Motion of Defendant Twentieth Century Fox Film Corporation, Bruna Papandrea, Laura Jeanne Reese Witherspoon, and David Fincher to Dismiss First Amended Complaint** was filed electronically by CM/ECF, which caused notice to be sent to all counsel of record.

Dated: March 1, 2018        By:     ____/s/ Ashley M. Schumacher_____
                                     Ashley M. Schumacher
                                     JENNER & BLOCK LLP
                                     353 North Clark Street
                                     Chicago, Illinois 60654
                                     Tel: (312) 840-8672

                                     *Attorney for Defendants Twentieth Century Fox Film Corporation, Bruna Papandrea, Laura Jeanne Reese Witherspoon and David Fincher*