**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **LESLIE WELLER,** an individual, | ) | |
| | ) | Case No. 1:17-cv-08799 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Hon. John Robert Blakey |
| | ) | |
| **GILLIAN FLYNN, PENGUIN RANDOM** | ) | Magistrate Judge Jeffrey Cole |
| **HOUSE LLC d/b/a CROWN PUBLISHING** | ) | |
| **GROUP, BRUNA PAPANDREA, LAURA** | ) | |
| **JEANNE REESE WITHERSPOON, LESLIE** | ) | |
| **DIXON, TWENTIETH CENTURY FOX** | ) | |
| **FILM CORPORATION, AND DAVID** | ) | |
| **FINCHER,** | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS TWENTIETH
CENTURY FOX FILM CORPORATION, BRUNA PAPANDREA, LAURA JEANNE
REESE WITHERSPOON, AND DAVID FINCHER's MOTION TO DISMISS
<u>PLAINTIFF'S FIRST AMENDED COMPLAINT</u>**

1

**TABLE OF CONTENTS**

I.    INTRODUCTION .................................................................................................... 1

II.   STANDARD OF REVIEW ...................................................................................... 2

III.  Plaintiff Has Sufficiently Alleged That Defendants Have Infringed Her Copyright ................ 2

A.  Plaintiff Has Sufficiently Alleged Access ..................................................................... 3

B.  Even If Plaintiff Is Deemed Not to Have Alleged Access, Plaintiff Has Alleged Sufficient
Striking Similarities to Impute Access ..................................................................... 6

C.  Plaintiff Has Sufficiently Alleged the Existence of Substantial Similarities Between OTB
and the Defendants' Works ..................................................................................... 7

1.   Defendants Use the Wrong Works for Determination of Similarities and Liability ....... 8

2.   Plaintiff Has Alleged Sufficient Probative Similarities in Protectable Expression for
Substantial Similarity Purposes ..................................................................... 10

a.  The Plot and Sequence of Events of OTB and the Infringing Works Are Similar ......... 10

b.  The Leading Characters in OTB and the Infringing Works Are Substantially Similar 11

c.  OTB and the Infringing Works Contain Substantial Similarities in Idiosyncratic
Authorial Choices ..................................................................................... 12

3.   Plaintiff Has Pled Facts Sufficient to Satisfy the Improper Appropriation Prong of
Substantial Similarity ..................................................................................... 13

4.   The Differences Between OTB and the Infringing Works Do Not Impact the
Analysis of Whether the Works Are Substantially Similar ..................................... 14

IV.    Plaintiff Has Sufficiently Alleged a Second Cause of Action for Vicarious Copyright

Infringement. ..................................................................................................................................17

V.   CONCLUSION. ...........................................................................................................................17

**TABLE OF AUTHORITIES**

# Table of Authorities

## Cases

*Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982) 3, 7, 14

*Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005) .................................................................. 2

*Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017) ............................... 3

*Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991) ............................. 2

*Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978) ................................ 6

*Francescatti v. Germanotta*, No. 11 CV 5270, 2014 WL 2767231, at *3 (N.D. Ill. June 17, 2014) ... 2, 3, 5

*Frerck v. John Wiley & Sons, Inc.*, 850 F. Supp. 2d 889, 895–96 (N.D. Ill. 2012) ......................... 2

*Gaiman v. McFarlane*, 360 F.3d 644, 661 (7th Cir. 2004) ...................................................... 12

*Hecker v. Deere*, 556 F.3d 575, 582–83 (7th Cir. 2009) ....................................................... 8

*Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992 ........................................... 8

*Le Moine v. Combined Commc'ns Corp.*, No. 95 5881, 1996 WL 332688, at *4 (N.D. Ill. June 13, 1996). 3

*MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ............................................. 17

*Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995) ................................................. 1

*Mid Am. Title Co. v. Kirk*, 991 F.2d 417, 421 (7th Cir. 1993). .............................................. 2

*Peters v. West*, 692 F.3d 629, 633–34 (7th Cir. 2012 ......................................................... 8

*Photofile, Inc. v. Graphicomp Sys.*, No. 92 C 8414, 1993 WL 375769, at *2 (N.D. Ill. Sept. 22, 1993).... 17

Sanford v. Columbia Broadcasting Sys., Inc., 594 F. Supp. 711 (N.D. Ill. 1984) ............................. 3

*Shaw v. Lindheim*, 919 F.2d 1353, 1356–57 (9th Cir. 1990 .......................................... 10, 12, 13

*Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 55 (2d Cir. 1936) .................................... 15

*Stillman v. Leo Burnett Co.*, 720 F. Supp. 1353, 1357 (N.D. Ill. 1989) ..................................... 8

*Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947) .................... 15

*Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) ...................... 2

## Treatises

Nimmer on Copyright § 13.02[A] ......................................................................... 4, 11

Plaintiff Leslie Weller ("Plaintiff") respectfully submits this Response in opposition to the Motion to Dismiss Plaintiff's First Amended Complaint ("FAC") filed by Defendants Twentieth Century Fox Film Corporation, Bruna Papandrea, Laura Jeanne Reese Witherspoon, and David Fincher (collectively, the "Film Defendants") (such Motion to Dismiss, the "Film Motion").

## I.       INTRODUCTION

Plaintiff has sued the Film Defendants, among other parties, on the basis of their involvement in the creation and exploitation of the film *Gone Girl* (the "Film"), which is based on the novel *Gone Girl* (the "Novel"). Plaintiff claims that the Film, the Novel, and all intermediate works (collectively, "Defendants' Works") are infringing, derivative works of Plaintiff's screenplay *Out of the Blue* ("OTB").[1]

In the Film Motion, the Film Defendants (a) focus on the differences between OTB and the Film, (b) assert that Plaintiff has failed to allege the necessary elements of a copyright infringement claim, and (c) opine on the purported bad quality of OTB versus the purported good quality of the Defendants' Works.

Originality is the touchstone of copyright protection. *See Mid Am. Title Co. v. Kirk*, 59 F.3d 719, 721 (7th Cir. 1995). It does not matter whether the Film Defendants (or anyone else, for that matter) think that OTB or the Defendants' Works are good, bad, or anything in between. Furthermore, it does not matter how much effort any of the Defendants may have contributed in creating the Defendants' Works. The amount of time and effort invested in a work is not relevant in

---

[1] The Film Defendants have submitted to the Court a copy of OTB from the Copyright Office (Registration No. Pau 3-350-973). For purposes of analyzing the expression contained in OTB, however, it would be more appropriate to use the version of OTB that Plaintiff provided to Alessandra in advance of their meeting on May 21, 2008. According to Plaintiff, this is the version that served as the basis for all of the infringing derivative works. A true and correct copy of OTB is attached hereto as Exhibit A.

determining copyright infringement. *See Mid Am. Title Co. v. Kirk*, 991 F.2d 417, 421 (7th Cir. 1993). Applying the appropriate standard of review, this Court should deny the Film Defendants' motion.

## II.    STANDARD OF REVIEW

In copyright infringement cases, Federal courts use the same standard of review for Rule 12(b)(6) motions as they do for motions for summary judgment. When ruling on a motion for summary judgment, courts must view evidence in a light most favorable to the nonmoving party and draw all reasonable inferences in the nonmovant's favor. *Frerck v. John Wiley & Sons, Inc.*, 850 F. Supp. 2d 889, 895–96 (N.D. Ill. 2012) (citing *Barnes v. Briley*, 420 F.3d 673, 677 (7th Cir. 2005)). The nonmoving party, however, cannot simply rest upon the pleadings and instead must provide facts showing that a genuine issue exists for trial. *Francescatti v. Germanotta*, No. 11 CV 5270, 2014 WL 2767231, at *3 (N.D. Ill. June 17, 2014). While a court serves as a gatekeeper in determining the sufficiency of Plaintiff's evidence, a court does not make credibility determinations, nor does it weigh conflicting evidence. *Id.* In this instance, Plaintiff is the nonmoving party. The Court must view evidence provided by Plaintiff – regardless of whether such evidence was contained in the FAC – in a light most favorable to Plaintiff, drawing all reasonable inferences in Plaintiff's favor.

## III.    PLAINTIFF HAS SUFFICIENTLY ALLEGED THAT DEFENDANTS HAVE INFRINGED HER COPYRIGHT

A plaintiff claiming copyright infringement must show both "'(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original.'" *Wildlife Express Corp. v. Carol Wright Sales, Inc.*, 18 F.3d 502, 507 (7th Cir. 1994) (quoting *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340 (1991)). Plaintiff has sufficiently alleged that she has a valid copyright in OTB (*see* FAC ¶¶ 13–16), and Defendants do not challenge this element. Instead, Defendants state that Plaintiff has failed to establish that Defendants copied OTB. (Film Motion at

6.) Considering that direct evidence of copying is often unavailable, copying may be inferred when the defendant had access to the copyrighted work and the accused work is substantially similar to the copyrighted work. *Atari, Inc. v. North American Philips Consumer Electronics Corp.*, 672 F.2d 607, 614 (7th Cir. 1982).

## A. Plaintiff Has Sufficiently Alleged Access

Courts in the Seventh Circuit have deemed the access requirement as "not onerous." *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017). In cases involving circumstantial evidence of access, courts in the Northern District of Illinois have determined that "[w]here an individual has an opportunity to view the creator's work, and there is . . . 'nexus' between the alleged copier and the individual possessing knowledge of the creator's work, a reasonable probability of access may be inferred by the trier of fact." *Le Moine v. Combined Commc'ns Corp.*, No. 95 5881, 1996 WL 332688, at *4 (N.D. Ill. June 13, 1996). The existence of "nexus" can be proven through a "channel of communication." *Francescatti v. Germanotta*, No. 11 CV 5270, 2014 WL 2767231, at *4 (N.D. Ill. June 17, 2014) (citing *Sanford v. Columbia Broadcasting Sys., Inc.,* 594 F. Supp. 711 (N.D. Ill. 1984) (finding a reasonable possibility of access regardless of CBS denying plaintiff's allegations that he submitted his to song to CBS's office in Illinois, which then allegedly sent the tape to CBS's Los Angeles office at a time when CBS allegedly knew that Michael Jackson was in contact with CBS and looking for a song to perform with Paul McCartney)).

In alleging the existence of a channel of communication, a plaintiff does not need to show that the creator of an infringing work was actually exposed to the copyrighted work for the purpose of proving reasonable possibility. *See Francescatti*, 2014 WL 2767231, at *4. Instead, if such a channel of communication "'involves a number of different people, each of whom . . . denies knowledge of the work,' access is reasonable, not a bare possibility." *Id.* at *4 (quoting *Nimmer on Copyright* §

13.02[A]). In cases in which "even the *existence* of such a channel of communication was denied by the defendant, but supported by some evidence from the plaintiff," courts in this District have denied summary judgment based on a finding that there was a reasonable possibility of access. *Francescatti*, 2014 WL 2767231, at *4 (emphasis in original) (citing *Sanford,* 594 F. Supp. at 713).

Here, Plaintiff has established the existence of a channel of communication between Pilar Alessandra – the individual possessing knowledge of OTB – and Flynn – the defendant whose alleged copying serves as the basis for Plaintiff's claims against all Film Defendants. (FAC ¶¶ 28–48.) Defendants inaccurately state that the Plaintiff's allegations require OTB to have changed hands "at least five times." (Film Motion, at 1). They attempt to introduce Laurie Lamson and Stephanie Rostan as necessary intermediaries within the channel of communication. (Film Motion, at 7). Plaintiff provides on-record statements made by Lamson to show the *latest* point at which Alessandra could have begun communicating with Sherry Ellis. (FAC ¶¶ 34–35.) Lamson's interview with Alessandra simply confirms that Alessandra communicated and collaborated with a writer represented by Levine Greenberg well in advance of Flynn's completion of the Novel. (*See* FAC ¶¶ 20, 23, 33–36, 39, 43.)

Defendants similarly insert Stephanie Rostan into the channel of communication though she is not a necessary component. (Film Motion, at 7). In addition to Rostan, Flynn thanks "everyone at Levine Greenberg Literary Agency" in the acknowledgments section of the Novel. (FAC ¶ 41 (citing GILLIAN FLYNN, GONE GIRL 417 (1st ed. 2012) (hereinafter, "Novel")). This is not just a turn of phrase, because Levine Greenberg is a small agency.[2] It is entirely reasonable that Flynn

---

[2] As of the date of this response, Levine Greenberg lists sixteen team members on its website, and archived captures of Levine Greenberg's website suggest that it had only fourteen people on staff in late 2009 when Flynn was in the early stages of writing the Novel. *Compare* WAYBACK MACHINE, http://lgrliterary.com/who-we-are/team/ (last visited Mar. 22, 2018)    *with* WAYBACK MACHINE, https://web.archive.org/web/20081219185559/http://www.levinegreenberg.com:80/html/team.html (last visited Mar. 22, 2018).

communicated with literally everyone at Levine Greenberg while writing the Novel over the course of almost three years. (*See* FAC ¶¶ 20, 41.) It is further reasonable that a small literary agency that touts its propensity to foster collaboration among writers and to contribute to its clients' works would have been proactive in connecting Flynn with Ellis.[3] (*See* FAC ¶¶ 37–39.)

Moreover, it is entirely reasonable that Levine Greenberg could have connected Flynn directly with Alessandra. By the time that Ellis and Alessandra collaborated, Levine Greenberg had already represented Ellis. (*See* WAYBACK MACHINE, https://web.archive.org/web/20090114220329/http://www.levinegreenberg.com:80/asp/category. php?category=118 (lasted visited Mar. 22, 2018).) With its focus on providing editorial development and writer collaboration services, (*see id.*), it is feasible that Levine Greenberg communicated directly with contributors to Ellis' book. Even if Levine Greenberg did not communicate with Alessandra directly, however, the analysis of nexus remains the same with the addition of Ellis to the channel of communication.

Importantly, in assessing the reasonableness of a channel of communication, timing of the connections among various intermediaries can support the possibility that a trier of fact could find nexus to satisfy the access element. *Francescatti*, 2014 WL 2767231, at *4. On May 21, 2008, Alessandra read and commented on OTB, at which time she possessed both electronic and hard copies of OTB. (FAC ¶¶ 28, 30.) Flynn started to write the Novel no earlier than March 2009, and the process took her almost three years. (FAC ¶¶ 18, 20.) Alessandra and Ellis collaborated no later

---

[3] Independent of the channel of communication alleged that involves Levine Greenberg, Plaintiff has also provided evidence that Defendant Flynn was represented by an agent at CAA with respect to film rights, and that Alessandra, by nature of her prominence within the film industry, had contacts at CAA. Unlike Levine Greenberg, CAA is a huge agency. As established in *Sanford*, however, courts in the Northern District of Illinois do not view an intermediary's size as a barrier to asserting of nexus through a channel of communication. *Sanford v. Columbia Broadcasting Sys., Inc.,* 594 F. Supp. 711 (N.D. Ill. 1984). Plaintiff has thus provided evidence of multiple reasonable theories of access, each of which independently is sufficient to satisfy Plaintiff's burden.

than 2010, with potential communication even earlier. (FAC ¶¶ 31–35.) According to December 2008 archived captures of the Levine Greenberg website's "Who We Represent" page, Ellis was listed as someone Levine Greenberg had represented by that time.[4]

Ultimately, the question of whether direct nexus exists between a third-party intermediary and the alleged infringer "depends on the credibility of the witnesses" and, viewing evidence in a light most favorable to a plaintiff, a chain of events can be deemed "reasonably possible." *Francescatti*, 2014 WL 2767231, at *5; *see also Allen v. Destiny's Child*, 006C 6606, 2009 WL 2178676, at *7 (N.D. Ill. July 21, 2009). In this instance, Plaintiff has surpassed her burden with respect to the access element.

### B. Even If Plaintiff Is Deemed Not to Have Alleged Access, Plaintiff Has Alleged Sufficient Striking Similarities to Impute Access

Regardless of whether Plaintiff has provided sufficient evidence of access, if Plaintiff has sufficiently alleged that OTB and the Novel contain striking similarities, then copying can be inferred. *Bucklew v. Hawkins, Ash, Baptie & Co., LLP.*, 329 F.3d 923, 926 (7th Cir. 2003) (citing *Ty, Inc. v. GMA Accessories, Inc.*, 132 F.3d 1167, 1169 (7th Cir. 1997)). In fact, "it is more straightforward to say that in some cases proof of access isn't required." *Bucklew*, 329 F.3d at 926 (citing *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978)). Two works are strikingly similar "when the similarities concern details of such an arbitrary character that the probability that the infringer had duplicated them independently is remote." *Bucklew*, 329 F.3d at 926.

---

[4] *See* WAYBACK MACHINE,
https://web.archive.org/web/20090114220329/http://www.levinegreenberg.com:80/asp/category.php?category=118 (last visited Mar. 22, 2018).

Identity between works can be powerful evidence of copying, but it is not the only factor in determining existence of striking similarity. *Ty, Inc.*, 132 F.3d at 1169. In assessing striking similarity, it is just as important to determine how much the purported striking similarities are "unlike anything that is in the public domain." *Id.* In trying to distinguish OTB and the infringing works, the Defendants have omitted discussion of the purported originality of the Film's source material. (*See, e.g.*, FAC ¶ 83(e).) Plaintiff has sufficiently alleged that elements that the Novel's readers perceived as unique are elements that are also contained in OTB. (*See* FAC ¶¶ 51–58; 67–68; 83.)

The inference of copying based on striking similarities can be rebutted by showing that a separate preexisting work could have served as the source for both works, thereby furthering the possibility of independent creation. *Ty, Inc.*, 132 F.3d at 1170. Despite the Defendants' attempts to label OTB as unoriginal, Defendants fail to take advantage of this apparent trump card. In focusing on the differences between the two works, Defendants have not provided a work that predates OTB that could have served as the source material for the striking similarities of the content contained in *both* works. While both OTB and the infringing works contain plenty of material that can be deemed unoriginal, the unique aspects that garnered praise for the infringing works are also contained in OTB without being contained anywhere else. (FAC ¶¶83-86). This supports the existence of striking similarities, allowing the Court to impute Defendants' access to OTB.

## C. Plaintiff Has Sufficiently Alleged the Existence of Substantial Similarities Between OTB and the Defendants' Works

In addition to access, plaintiffs claiming copyright infringement must show that an accused work is substantially similar to the copyrighted work. *Atari*, 672 F.2d at 614. Traditionally, "substantial similarity" has consisted of two separate components: (1) copying and (2) improper appropriation. *Id.* The first prong of copying can be established by showing access and some degree

of similarity that would make independent creation unlikely. This required level of similarity may or may not be substantial and is sometimes referred to as "probative similarity." *See Laureyssens v. Idea Grp., Inc.*, 964 F.2d 131, 140 (2d Cir. 1992), *as amended* (June 24, 1992). "Copying," as the first prong of substantial similarity, "is limited to the purely factual issue of whether the defendant used the plaintiff's work as a starting point for his own." *Stillman v. Leo Burnett Co.*, 720 F. Supp. 1353, 1357 (N.D. Ill. 1989).

If there is access and sufficient objective or extrinsic similarities to be probative of copying, one moves to the second part of the substantial similarity analysis. This second prong – sometimes referred to as "improper appropriation" – looks to the response of the "ordinary observer." *Atari*, 672 F.2d at 614. This is a subjective or intrinsic test and seeks to determine whether "an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." *Id.*

Noting the variety of tests used throughout Federal circuits that ultimately reach similar outcomes, the Seventh Circuit has more recently started using a more streamlined analysis based on whether "two works share enough unique features to give rise to a breach of the duty not to copy another's work." *Peters v. West*, 692 F.3d 629, 633–34 (7th Cir. 2012). In the First Amended Complaint, Plaintiff has provided sufficient support for a finding of substantial similarity using both the traditional and newer approaches.

## 1. Defendants Use the Wrong Works for Determination of Similarities and Liability

As the Film Defendants state, courts indeed may consider documents integral to a plaintiff's allegations that are not attached as exhibits to a complaint. (Film Motion, at 8 n.2. (citing *Hecker v. Deere*, 556 F.3d 575, 582–83 (7th Cir. 2009))). By providing the Court with a copy of the Film and an

alleged deposit copy of OTB's third registration with the Copyright Office, however, the Film Defendants provide the wrong works for the Court's analysis. Throughout the Film Motion, the Film Defendants compare the Film and OTB as if there were no intermediate infringing works and as if the Film Defendants' liability for copyright infringement begins with the Film. (*See* Film Motion, at 13–20).

In the First Amended Complaint, Plaintiff focuses primarily on similarities between OTB and the Novel, because the original point of infringement occurred when the Novel was written, not when the Film was created. (*See* FAC ¶¶ 17-26.) As is typical with adaptations, with each iteration of copying of OTB's unique features, fewer and fewer similarities were incorporated into downstream derivative works. Creation of derivative works is one of the exclusive rights of a copyright owner. *See* 17 U.S.C. § 106(2). A work is a "derivative work" if it is "based on or derived from one or more already existing works." U.S. Copyright Office, *Copyright in Derivative Works and Compilations*, https://www.copyright.gov/circs/circ14.pdf; *see also* 17 U.S.C. § 101 (2012). If the Novel is deemed to infringe Plaintiff's copyright in OTB and a downstream derivative work of the Novel incorporates *any* protectable expression contained in OTB, then a derivative work of the Novel (such as the Film) would also be a derivative work of OTB, thereby infringing upon Plaintiff's copyright in OTB.[5] *See* 17 U.S.C. § 106(2).

Regardless of whether the Film is deemed to be a derivative work of OTB, the Film Defendants' potential liability for copyright infringement would begin with the very first draft of the

---

[5] Standard film- and publishing-industry contracts relating to conveyance of intellectual property rights frequently include representations, warranties, and indemnification provisions relating to non-infringement of third-party intellectual property rights. Eliminating liability for creators of downstream derivative works (such as, in this case, the Film and various screenplay versions) that are based on an unauthorized derivative work (in this case, the Novel) would render such provisions moot.

screenplay of *Gone Girl* written by Flynn – not with the Film and not with the final shooting script, which almost certainly has had contributions from multiple ghostwriters.[6] (*See* FAC ¶¶17-27.)

### 2. Plaintiff Has Alleged Sufficient Probative Similarities in Protectable Expression for Substantial Similarity Purposes

Independent of and in addition to sufficient allegations of striking similarities for access purposes, Plaintiff has sufficiently alleged the existence of substantial similarities between OTB and the Defendants' Works. "The test for infringement of a copyright is of necessity so vague." *Dave Grossman Designs, Inc. v. Bortin*, 347 F. Supp. 1150, 1156 (N.D. Ill. 1972). There is no bright-line test, formula, or rule for determining the line between infringing and non-infringing copying, and decisions must therefore inevitably be handled on a case-by-case basis. *Peter Pan Fabrics, Inc. v. Martin Weiner Corp.*, 274 F.2d 487, 489 (2d Cir. 1960). Importantly, the question is whether the content copied by the defendant is a significant portion of the plaintiff's work, not the defendant's. *See Newton v. Diamond*, 388 F. 3d 1189, 1195 (9th Cir. 2004). Nuances of various industries also serve to influence the determination of whether similarities between works are substantial. In cases involving fictional literary and dramatic works, courts typically consider plot, sequence of events, characters, mood, theme, pace, dialog, and setting. *See, e.g.*, *Shaw v. Lindheim*, 919 F.2d 1353, 1356–57 (9th Cir. 1990).

### a. The Plot and Sequence of Events of OTB and the Infringing Works Are Similar

Defendants allege that the similarities in plot and sequence of events are too abstract to be protectable. (Film Motion, at 15-16). They further deem the similarities as "legally irrelevant." (Film

---

[6] For Defendant Fincher, the latest point at which his liability would begin is the first draft of the Film's screenplay to which he contributed.

Motion, at 13.). Plaintiff's erring on the side of listing all events that appear similar "does not change the fact that many of the events in the two works are substantially similar." *Shaw*, 919 F.2d at 1362–63. The *Shaw* Court further determined, even if none of the plot elements alleged by a plaintiff are remarkably unique by themselves, a triable question of substantial similarity of protectable expression can arise from the fact that both works contain those particular plot-point similarities. *Id.* at 1363. This is in line with the reasoning and dicta stemming from the Seventh Circuit with respect to copyrightability of a unique combination of elements that are not individually copyrightable. JCW, 482 F.3d at 917; *Hobbs,* 722 F.3d at 1093 note 4 (citing, *inter alia,* Feist, 499 U.S. at 362). Moreover, "[w]here plot is . . . properly defined as 'the "sequence of events" by which the author expresses his "theme" or "idea,"' it constitutes a pattern which is sufficiently concrete so as to warrant a finding of substantial similarity if it is common to both plaintiff's and defendant's works." *Shaw*, 919 F.2d at 1363 (quoting *Nimmer on Copyright* § 1303[A], at 13–31).

Plaintiff has provided a list of similarities in plot and sequence of events, because (1) a list is most convenient for pleading purposes, (*see* FAC ¶¶ 51-66); and (2) the test from *Peters* relates to whether there are *enough* unique similarities. 692 F.3d at 633–34 (emphasis added). Plaintiff presents similarities that she views as indicative of copying and a reasonable, ordinary observer could conclude that these similarities are substantially similar. She happens to do so in list form. Such a list would still be legally significant, because the similarities indeed exist and are of a unique enough nature to be well beyond the threshold of protectable expression.

### b. The Leading Characters in OTB and the Infringing Works Are Substantially Similar

With respect to similarities between characters, a triable issue of fact regarding substantial similarity has been found when there are similar personal traits in the lead characters. *See, e.g., Shaw*, 919 F.2d

11

at 1358 ("Both parties' scripts have similar lead characters."). The *Shaw* court noted that the "totality of the similarities between the two characters goes beyond the necessities of the . . . theme and belies any claim of literary accident." *Id.* at 1363. Here, Plaintiff has provided a list of stark similarities between *two* lead characters contained in OTB and the Novel (many of which were subsequently copied into the Film). (FAC ¶¶ 67–68.)

In the Film Defendants' attempt to show that Plaintiff has only alleged unprotected elements as being similar, the Film Defendants erroneously allege that Plaintiff claims ownership of *scenes a faire* such as the "archetype of the murderous *femme fatale*." (Film Motion, at 14.) This is not true, though the Seventh Circuit has determined that even stock characters can be copyrightable when they are "sufficiently distinctive." *Gaiman v. McFarlane*, 360 F.3d 644, 661 (7th Cir. 2004).

Plaintiff has set forth extensive lists of similarities between the female leads and the male leads of *OTB* and the Novel, (*see* FAC ¶¶ 67–68), which similarities takes these characters well beyond *scenes a faire* and make them sufficiently distinctive so as to be copyrightable. The FAC's extensive lists of traits and biographies shared by the female and male leads can be matched to expression found in both OTB and the Novel, in spite of the fact that OTB is constrained by the screenplay format that emphasizes only writing what can be seen or heard and requires a certain amount of flexibility for casting purposes.[7]

### c. OTB and the Infringing Works Contain Substantial Similarities in Idiosyncratic Authorial Choices

---

[7] Plaintiff addresses why Defendants' false distinctions of the lead characters in OTB and the infringing works in more detail in her response to Defendant PRH's motion to dismiss. (PRH Motion §§). If the Court deems that a reasonable ordinary observer could conclude that OTB's lead characters are substantially similar to the lead characters of the Novel, it would be incongruous to conclude that the Film's lead characters are not also substantially similar to OTB's lead characters, regardless of whether not all of the characters' traits transferred from the Novel into the Film.

Courts do not typically give much weight to similarities in setting or theme for substantial similarity purposes, but similarities in setting and theme can still serve as probative similarities and cross over into the realm of protectable expression. *See Shaw*, 919 F.2d at 1362-63. With respect to setting, Plaintiff has addressed in the PRH Response certain similarities that a reasonable ordinary observer could construe as substantial. (*See* PRH Response at 16–17). Though these similarities are more apparent in the Novel, their expression translates from the page onto the screen and is still evident in the Film.

In addition to setting, though not dispositive, works' handling of themes can impact the substantial similarity analysis. *See Shaw*, 919 F.2d at 1363. Both OTB and the Novel (as well as the Film) open with a question of how well one person can really know another person. Introduction of this theme in both works corresponds with an image of the female lead's head.[8] This is just the beginning of substantial similarities with respect to the treatment of the theme, as both works continue to address the theme through substantially similar plot points, scenes, and character reactions.

### 3. Plaintiff Has Pled Facts Sufficient to Satisfy the Improper Appropriation Prong of Substantial Similarity

If a plaintiff has successfully alleged access and has provided sufficient objective or extrinsic similarities to be probative of copying, the analysis moves to the second prong of substantial similarity – "improper appropriation" – which looks to the response of the "ordinary observer."

---

[8] In OTB, after a quick establishing shot, there is a close-up of Mary's bloody head, followed by a voiceover: "Do you ever really know anyone? I mean, deep down, do you really know? . . . . You haven't been together very long -- Mary, are you listening?" (OTB at 1.) The Film opens with Nick's voiceover stating, "When I think of my wife, I always think of her head." Right after fade-in, the first image is of the back of Amy's head, with Nick's voiceover continuing: "I picture cracking her lovely skull, unspooling her brain . . . Trying to get answers . . . . The primal questions of a marriage: What are you thinking? How are you feeling?" (*Gone Girl* Screenplay (as revised), at 1, available at http://www.dailyscript.com/scripts/GoneGirl_Final_Shooting_Script.pdf).

Under the traditional Seventh Circuit approach espoused in *Atari*, the ordinary observer test relates to whether an ordinary reasonable person would conclude that the defendant unlawfully appropriated the plaintiff's protectible expression by taking material of substance and value." 672 F.2d at 614. The test boils down into whether an ordinary, reasonable observer would conclude that "the accused work has captured the 'total concept and feel' of the copyrighted work." *Id*. Under the more streamlined method used in *Peters*, the Seventh Circuit simply sought to determine whether "two works share enough unique features to give rise to a breach of the duty not to copy another's work." 692 F.3d at 633–34.

Plaintiff has alleged that the elements of the Novel that readers found most valuable and substantive are the pieces of protectable expression that are also contained in *OTB*. (FAC ¶¶ 83-86.)[9] These professional and layperson reviewers serve as proxies for the reasonable, ordinary observer. These reviewers also discuss the uniqueness of elements in the Novel – elements that existed in OTB long before the Novel was written. *See id*. Because of the subjective nature of the ordinary observer test for improper appropriation, courts frequently note that summary judgment – the same standard as that used for motions based on Federal Rule of Civil Procedure 12(b)(6) – is inappropriate for determining whether two works are substantially similar.

### 4. The Differences Between OTB and the Infringing Works Do Not Impact the Analysis of Whether the Works Are Substantially Similar

[9] Plaintiff became aware of the infringement only after arms-length script readers read OTB after release of the Film and asked her whether she had seen the Film. These readers thought that OTB was similar to the Film and thought that OTB was derivative of the Film. Only after hearing of these allegations did Plaintiff watch the Film and read the Novel. These readers qualify as ordinary, reasonable observers who determined that the Film (and, even more so, the Novel) captured the total concept and feel of OTB. To the extent that Plaintiff's omission of these facts as an allegation in the FAC makes any difference to the Court with respect to the ordinary observer test, Plaintiff respectfully requests to amend the FAC or provide a declaration to that effect.

Throughout their motion, the Film Defendants elect to focus on the dissimilarities between *OTB* and the Novel. (Film Motion, at 8–20). The existence of differences does not negate the existence or extent of similarities, nor the importance of those similarities. When assessing substantial similarity, the focus is properly on the similarities, not the differences. *Atari, Inc.*, 672 F.2d at 618–19. Further, the similarities do not need to be exact to establish infringement. *Id.* at 618. "[I]t is enough that substantial parts were lifted; no plagiarist can excuse the wrong by showing how much of his work he did not pirate." *Id.* at 619 (quoting *Sheldon v. Metro-Goldwyn Pictures Corp.*, 81 F.2d 49, 55 (2d Cir. 1936)). Further, an infringement "includes also the various modes in which the matter of any work may be adopted, imitated, transferred, or reproduced, with more or less colorable alterations to disguise the piracy." *Id.* at 618 (quoting *Universal Pictures Co., Inc. v. Harold Lloyd Corp.*, 162 F.2d 354, 360 (9th Cir. 1947)).

OTB is a 122-page screenplay that was used in the writing of a 400+-page novel. The standard format for screenplays (especially spec scripts that need to optimize use of space in order to receive any interest from producers) also leads to fewer words existing on a page than in a book. Proper screenplay writing also requires that the words on the paper relate solely to what can be seen and heard. This dynamic is in stark contrast to novels, which can explore characters' internal thoughts and insert frivolous scenes that do not move the story along, which Flynn has admitted to having done in the Novel.[10] Under these circumstances, differences between OTB and the Novel are inevitable. The Novel was subsequently used to create multiple versions of a screenplay, which was subsequently created into the Film. (FAC ¶¶.) With each iteration, more and more differences were

---

[10] In response to an interviewer's question of whether she ever adds material to a story that has no purpose in the story, Flynn responds that she does and cites, as an example, the "entire scene" in the abandoned shopping mall contained in the Novel (and subsequently incorporated into the Film) is not there "for any reason other than that [she] wanted all the characters to be running around in an abandoned shopping mall." Gillian Flynn, *Gillian Flynn Talks "Gone Girl" on The Interview Show*, YOUTUBE (Aug 29, 2012), https://youtu.be/ojOfbgzzIMs?t=955.

introduced, but Plaintiff's original, protectable expression remained the spine of all these derivative works.

Defendants point to Defendant Flynn's prior comments regarding the influence of the Laci Peterson case on the Novel as something that should somehow affect the analysis. (Film Motion §§.) If the Laci Peterson case shared any aspects that also existed in *OTB*, then indeed, Defendants would be able to point to this as something that may have served as a preexisting source for independent creation. Defendants cannot do so, however, because the Laci Peterson case is entirely different from *OTB*. At most, they both contain a man suspected of harming his wife, which, by itself, would be an unprotectable idea.[11] Because there are no more similarities between the Laci Peterson case and *OTB*, Flynn's reliance on that real-life story for inspiration *in addition* to the elements shared with *OTB* is simply indicative of Flynn's need to rely on preexisting material.

In an effort to trivialize the similarities between *OTB* and the Novel, PRH overstates the importance of the other aspects of the infringing works, such as the media. (Film Motion, at 4, 6, 15-17, 19, 20). Flynn has stated that "the media is a constant Greek chorus for both the novel and the film." *'Gone Girl' writer Gillian Flynn talks NYFF, revisits Nick & Amy Dunne*, ABC7NY.COM, (July 27, 2015), http://abc7ny.com/entertainment/gone-girl-writer-gillian-flynn-talks-nyff/311248/. Plaintiff agrees with Flynn's assessment, in that, same as a Greek chorus, the media (and the police, for that matter) comment on the (a) suspicious nature of the husband's inappropriate reactions to what has happened to his wife, (b) the husband's suspiciously dangerous and dismissive behavior represented in the diary of flashbacks of their married life, and (c) the discovery that the wife had been purportedly pregnant. Without these story elements, the existence of media and police in the Novel would be meaningless, and these story elements exist in the original story told by OTB. As discussed

---

[11] In the case of Laci Peterson, the husband actually *did* harm his wife.

above, (*supra*, §III.C.2.a), this substantially similar story is expressed in OTB and the Novel using particular sequences and scenes with sufficiently distinctive characters populating them.

## IV. Plaintiff Has Sufficiently Alleged a Second Cause of Action for Vicarious Copyright Infringement.

Plaintiff does not contend that the existence of direct copyright infringement is a prerequisite for a finding of vicarious copyright infringement. As discussed above, however, Plaintiff has alleged facts sufficient to sustain her claims of direct copyright infringement. Though Defendants have not argued to the contrary, Plaintiff has sufficiently alleged the remaining elements of vicarious copyright infringement.

Vicarious infringement occurs when a defendant has (a) the right and ability to supervise the infringing activities and (b) a direct financial interest in those activities. *Photofile, Inc. v. Graphicomp Sys.*, No. 92 C 8414, 1993 WL 375769, at *2 (N.D. Ill. Sept. 22, 1993); s*ee also MGM Studios, Inc. v. Grokster, Ltd.*, 545 U.S. 913, 930 (2005) ("[one] infringes vicariously by profiting from direct infringement while declining to exercise a right to stop or limit it"). Plaintiff has sufficiently alleged that all the relevant defendants had a direct financial interest from continuing infringement of OTB through the various unauthorized derivative works and at various points could have stopped or limited direct infringement in the infringement activity. (FAC ¶¶ 114-20.)

## V. CONCLUSION.

Plaintiff has sufficiently alleged that (a) the Film Defendants had access to OTB, and (b) the Novel and all downstream derivative works (including the Film) contain substantial similarities to OTB. Plaintiff respectfully submits that the Court, after construing all evidence in a light most favorable to Plaintiff, deny the Film Defendants' motion to dismiss the First Amended Complaint.

Dated:       March 22, 2018

 

Respectfully submitted,

/s/Adam E. Urbanczyk
By: Adam E. Urbanczyk
Ziliak Law LLC
141 W. Jackson Blvd. Suite 4048
Chicago, IL 60604
adamu@ziliak.com
(312) 462-3350
ARDC: No. 6301067
*Attorney for Plaintiff Leslie Weller*