**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| LESLIE WELLER, | |
| Plaintiff, | Case No. 17-cv-8799 |
| v. | Judge John Robert Blakey |
| GILLIAN FLYNN, et al., | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Leslie Weller claims that the novel and movie *Gone Girl* infringe her screenplay *Out of the Blue* in violation of the Copyright Act, 17 U.S.C. § 101 *et seq.* [55]. She sued *Gone Girl*'s author and screenwriter, Gillian Flynn, together with Flynn's publisher and various individuals and entities involved in producing and distributing the film. *Id.* Defendants moved to dismiss Plaintiff's claims. [70, 73, 75, 77]. For the reasons explained below, this Court grants Defendants' motions.

## I.    Background[1]

### A.    Development of the Works

In 2005, Plaintiff wrote a screenplay titled *Out of the Blue*. [55] ¶¶ 1, 13. Plaintiff revised the script over the next few years, registering different versions with the United States Copyright Office in 2006 and 2007. *Id.* ¶¶ 1, 15. Plaintiff registered a third and final version of *Out of the Blue* with the Copyright Office in July 2008 (OTB3). *Id.* ¶ 16. Defendants' alleged copying of OTB3 forms the basis of

---

[1] The facts in this section come primarily from Plaintiff's amended complaint [55]. All references are by docket entry number.

Plaintiff's suit. *See id.* ¶¶ 28, 43, 47–82, 100–06, 111, 114.

Around March 2009, Random House—Flynn's publisher—advanced Flynn $150,000 for a new novel. *Id.* ¶¶ 18–19.[2] Flynn wrote the book *Gone Girl* over roughly the next three years. *Id.* ¶ 20. In December 2011, Defendant Leslie Dixon sent a copy of Flynn's unpublished manuscript to Defendant Laura Jeanne Reese Witherspoon. *Id.* ¶ 21. Witherspoon, Dixon, and Witherspoon's then-business partner Bruna Papandrea began looking for a studio to produce a film version of the novel. *Id.* ¶ 22. In June 2012, a division of Penguin Random House published *Gone Girl* to significant financial success. *Id.* ¶¶ 23, 89.

According to Plaintiff, in July 2012 Witherspoon, Papandrea, and Dixon brokered Defendant Twentieth Century Fox's purchase of the book's film rights and secured Flynn to write the screenplay. *Id.* ¶ 24. Plaintiff alleges that Witherspoon and Papandrea then produced the film, which gave them "the right and ability to supervise, control, or stop the infringing conduct"—in other words, to shape or halt the film's development. *See id.* ¶¶ 8–9, 48, 116. Plaintiff's complaint also generally alleges that all Defendants targeted sales of the novel and the film at residents of Illinois; entered contracts or collaborated with an Illinois resident (Flynn); and/or injured Plaintiff by their "exploitation" of the novel and film within Illinois. *Id.* ¶ 3. The complaint acknowledges that Witherspoon resides in California and Papandrea resides in Australia. *Id.* ¶¶ 8–9.

Witherspoon and Papandrea submitted affidavits countering Plaintiff's narrative. *See* [76-1, 76-2]. Both agree that they spoke to Flynn about adapting the

---

[2] Random House is the predecessor-in-interest of Defendant Penguin Random House. [55] ¶ 18.

novel, either by phone or in Los Angeles, California. [76-1] ¶ 3.[3] In their account, however, Twentieth Century Fox "reached out to Flynn directly" and secured the novel's film rights without their involvement. *Id.* ¶ 4. After reaching a deal with Flynn, Twentieth Century Fox entered a separate agreement with Witherspoon, Papandrea, and Dixon to compensate them for their earlier efforts to secure studio support for a film version of *Gone Girl. See id.* ¶¶ 3–4. That agreement accorded Witherspoon and Papandrea producer credits on the film. *Id.* ¶ 4. Witherspoon and Papandrea attest that they made no creative contributions to the film's storyline, exercised no control over its production, never visited Illinois in connection with the film, and played no role in distributing or advertising the film. *See id.* ¶¶ 4–8.

In response, Plaintiff offers a number of articles and public statements referencing Witherspoon and Papandrea's involvement with the film. *See* [83] at 7. In a 2015 speech, Witherspoon described optioning *Gone Girl* and stated that it was one of two films that her production company "made" that year. [83-3] at 6. News articles refer to Witherspoon and Papandrea optioning and producing the film, *see* [83-4, 83-5], although another article cited in Plaintiff's complaint reported that "Witherspoon and Papandrea had little to do with the production of 'Gone Girl,'" [55] at 4 n.5 (citing Jenelle Riley, *Reese Witherspoon, Bruna Papandrea Push for Female-Driven Material with Pacific Standard*, Variety (Oct. 7, 2014)). Plaintiff notes that Witherspoon and Papandrea do not deny negotiating with Flynn for *Gone Girl*'s film rights or optioning the novel while Flynn resided in Illinois. [83] at 8, 12.

---

[3] For brevity, this Court cites only Witherspoon's affidavit, but Papandrea's contains nearly identical facts. *Compare* [76-1], *with* [76-2].

After Twentieth Century Fox obtained the film rights, Defendant David Fincher signed on to direct and worked with Flynn to revise her adapted screenplay. *Id.* ¶ 25. Twentieth Century Fox released and distributed the movie in 2014, to substantial financial success. *See id.* ¶¶ 26, 91, 110.

## B. Access

Plaintiff claims that sometime between May 2008 and the novel's publication in 2012, Flynn had access to OTB3 and unlawfully incorporated elements of it into the novel. *See id.* ¶¶ 28, 43, 47, 48. According to Plaintiff, OTB3 reached Flynn through a network of connections passing through Flynn's literary agency.

In May 2008, Plaintiff emailed a copy of OTB3 to Pilar Alessandra, a screenwriting instructor and "script consultant." *Id.* ¶¶ 28–29. A few days later, Plaintiff met with Alessandra for advice on OTB3, after which Alessandra retained a hard copy of the screenplay. *Id.* ¶ 30. Around 2010, Alessandra contributed to a screenwriting instruction anthology, co-edited by Sherry Ellis and Laurie Lamson. *See id.* ¶¶ 31–33. In 2015, Alessandra interviewed Lamson on a podcast and noted that she and Lamson began corresponding around 2010. *Id.* ¶ 34.

The website for the Levine Greenberg Rostan literary agency (LGR) lists Ellis as one of its authors (though Ellis died in 2011). *Id.* ¶¶ 32, 36. LGR's website touts its editorial and development services for writers, and—at least in 2009—hyped its "co-agents in Hollywood" who handled "movie and television rights." *Id.* ¶¶ 37–40. In the acknowledgements section of the book *Gone Girl*, Flynn thanks LGR's name partners for their "advice" and "guidance." *Id.* ¶ 41.

Plaintiff alleges that LGR represented both Ellis and Flynn after Alessandra received a copy of OTB3 in 2008 and before *Gone Girl*'s publication in 2012, while Ellis was collaborating with Alessandra. *Id.* ¶ 43. LGR served as Flynn's literary agent as of July 2011 and provided her with "editorial development services and writer collaboration services." *Id.* ¶¶ 44–45. A different firm—Creative Artists Agency (CAA)—represented Flynn with respect to film rights. *Id.* ¶ 45. Alessandra also had "professional relationships" with CAA representatives. *Id.* ¶ 46.

According to Plaintiff, Flynn gained access to OTB3 or "an unauthorized derivative version" of it "through her agents" before June 2012. *Id.* ¶ 47. The remaining Defendants "had access to OTB3's original creative elements" only through the novel and screenplay versions of *Gone Girl*. *Id.* ¶ 48.

## C. Content of the Works

On a motion to dismiss, this Court may consider materials referred to in the complaint and central to the plaintiff's claims. *See Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013). In cases alleging copyright infringement, that rule generally encompasses the original and challenged works. *See Hobbs v. John*, 722 F.3d 1089, 1091 n.2 (7th Cir. 2013); *see also* [55] ¶¶ 1, 107–11, 115–18. Accordingly, this Court reviewed copies of OTB3 [71-2], and the novel [71-1] and film [41-2] versions of *Gone Girl*, and provides brief summaries of the material. Obviously, spoilers lie ahead for any reader who has not read or seen the works.

### 1. OTB3

OTB3 opens with a shot of its central protagonist, Mary, immediately after a car accident. Her mother, June, asks in voice-over: "Do you ever really know

anyone?" The action then flashes back to the first time Mary met her husband, Steve. Mary and her then-partner Carl come across Steve at a night-club and prevent him from driving drunk, which prompts Steve to pursue Mary. From there, the story unfolds chronologically through brief scenes of Steve and Mary's relationship and eventual marriage, which quickly becomes an unhappy one.

Steve—"charming," "confident," and "well-bred"—comes from a wealthy family that disapproves of Mary. Mary appears naive and vulnerable, insecure about Steve's reasons for marrying her. Carl, a racecar driver, stays in the picture, periodically showing up at Mary and Steve's house and provoking Steve's jealousy.

Steve and Mary's relationship deteriorates; Steve drinks heavily and seems to threaten Mary. Then, while Mary is driving, the two end up in the car crash depicted in the opening scene. Following the accident, Mary wakes to discover she has been in a coma for seven years. During that time, she has given birth to a son (Little Steve) and Steve has divorced her to marry Eileen, a "sleek, sophisticated" yoga instructor who has become close to Little Steve.

Mary's resentment of Steve and Eileen turns to rage as she sees herself shut out of Little Steve's life. When Carl shows up to visit Mary, the audience learns that the two of them planned the car accident, intending to kill Steve and profit from his life insurance policy. Carl and Mary had been having an affair, and Little Steve might be Carl's son.

Mary's increasingly angry and possessive behavior tips into the criminal as she stalks and threatens Steve. She then attempts to kill Steve at his hunting

cabin; the two grapple in an increasingly violent fight that culminates in violent sex. This rekindles their regard for each other and they begin an affair, with Steve drawn to Mary's newly-revealed aggressiveness. Steve loses interest in Eileen, and he and Mary devise a plan to kill Eileen and resume their life as a family with Little Steve. To that end, Steve lures Eileen to the hunting cabin. Mary attempts to shoot Eileen, who escapes. Carl appears, shoots and kills Steve, and drives away. Mary and Eileen then try to kill each other, and Eileen succeeds. OTB3 ends with a final scene between Carl and Steve's estranged brother Mark; the audience realizes that Carl and Mark are lovers who have been plotting Steve's downfall all along.

## 2.    Alternate Version of OTB

In response to Defendants' motions to dismiss, Plaintiff contends that her infringed work is *not* OTB3 but an earlier draft of the screenplay, [84-2], which Plaintiff now says is the version she gave Alessandra in 2008, [84] at 5 n.1. This contradicts Plaintiff's complaint, *see* [55] ¶¶ 28, 30, and leaves unclear whether the draft that Plaintiff now offers is even protected by copyright—a prerequisite for her claims. Although plaintiffs generally cannot amend a complaint through briefs opposing a motion to dismiss, *see, e.g., Perkins v. Silverstein*, 939 F.2d 463, 470 n.6 (7th Cir. 1991), the new draft that Plaintiff provided so closely resembles OTB3 that this Court need not expend resources in permitting a separate, superfluous amendment. Rather, this Court's analysis of OTB3 applies equally to this new version of the screenplay, and this Court briefly notes the minor, immaterial differences between the two drafts.

The alternate version of *Out of the Blue* follows the same structure as OTB3, opening with a flash-forward to Mary and Steve's accident before tracing their relationship through its deterioration, Mary's coma, and the bloody shoot-out at Steve's hunting cabin. The alternate version provides some additional details about Mary ("she read wedding magazines her whole life") and Steve ("like other children of the wealthy, he presents well by hiding emotion"). It also includes new or expanded scenes of Steve's family, fleshing out his parents' snobbery and Mark's troubled relationship with his family, stemming from their homophobia. Finally, when Mary and Steve enact their plan to kill Eileen, Steve befriends a couple of hunters while Mary stalks Eileen. The remaining scenes substantially match those in OTB3, as do the themes, dialogue, and characters. *Compare* [84-2], *with* [71-2].

### 3. *Gone Girl*: Novel

The novel is divided into three parts. Part One opens on "The Day Of" the disappearance of Amy Dunne, as her husband, Nick, wakes up on the morning of their fifth anniversary. In the opening passage, Nick conjures an image of his wife's head and recalls how he has often wondered: "What are you thinking Amy? How are you feeling? Who are you? What have we done to each other?" A brief exposition establishes that Nick and Amy used to be magazine writers in New York City, but lost their jobs in the Great Recession and moved back to Nick's Missouri hometown when his mother got sick. Amy, a native New Yorker, is the child of two psychologists who wrote a series of instructive children's books about "Amazing Amy," an idealized version of her. The chapter proceeds as Nick narrates (most of)

his activities in the hours before Amy's disappearance, which he discovers upon returning from the bar that he runs with his twin sister Margo (Go).

From there, Part One alternates between Nick's present—the days following Amy's disappearance—and Amy's past, depicted through her diary entries. The diary chapters narrate Nick and Amy's courtship and marriage, eventually catching up to the day of Amy's disappearance. Nick's narrative reveals his estrangement from Amy and his growing self-consciousness and discomfort with the scrutiny he receives from the public, the media, and the police in the wake of Amy's disappearance. Nick relates his troubled relationship with his father—an embittered, misogynist presence in Nick's life—and displays his desperate need for approval. As Nick notes the lies he tells the police and pursues an affair with a much younger woman, his chapters raise the reader's suspicion that he is an unreliable narrator who may have actually killed Amy. Mid-investigation, the public revelation that Amy was pregnant when she disappeared increases national outrage over Amy's case. Unfolding in parallel, Amy's diary entries record her deteriorating relationship with Nick and his spiraling behavior, from maxing out their credit on luxury goods, to infidelity, to domestic violence.

Part One closes, however, with the reveal that the expensive items Nick supposedly bought are stashed—without his knowledge—in Go's woodshed. Part Two opens with Amy—very much alive—narrating how she staged her disappearance. Along with the reader, Nick realizes that Amy framed him for her own murder, in revenge for his infidelity. Amy's "diary" entries are fake, one of

many carefully staged clues that Amy left to incriminate Nick. So is her pregnancy, which she invented to inflame public opinion against Nick.

Following this revelation, Part Two continues to alternate between Nick and Amy's points of view, which now follow roughly the same timeline. Nick hires an expensive, media-savvy attorney, Tanner Bolt, and he, Bolt, and Go strategize along dual tracks: how to regain the public's sympathy (as cable news rushes to convict him) and how to tempt Amy out of hiding. Nick finds out that Amy has framed others before him: Hilary Handy, a girl that Amy accused of stalking her in high school, and Tommy O'Hara, an ex-boyfriend that Amy accused of rape. Amy, meanwhile, disguises herself and hides out in the Ozarks until she is robbed and forced to turn to her wealthy ex-boyfriend, Desi Collings. Still obsessed with her, Desi agrees to keep her secret and hides her at his lake house. Over the next weeks, Desi becomes controlling and possessive, effectively making Amy his prisoner. From Desi's lake house, Amy follows news coverage of her disappearance, and, moved by Nick's TV interviews, decides she wants to return to him. As Part Two ends, the police arrest Nick and Amy moves to free herself.

In Part Three, Amy returns to Nick covered in blood, causing a frenzy among the media camped in front of their house. Amy tells the police that Desi abducted her and she killed him to escape. The reader and Nick, however, know that Amy decided to murder Desi to return to Nick, who she now believes has proved his devotion to her. Amy convinces the public, but Detective Rhonda Boney does not trust her story. Boney, Nick, and Go try to prove what really happened, even as

Nick puts on a front of reconciliation for the media. Nick admits to himself that he remains fascinated by Amy, but his primary desire is to prove what Amy did and to leave her without fear of retribution.

Amy knows that Nick wants to leave; in a final act of manipulation she impregnates herself with a stored sample of Nick's sperm. When Amy reveals her pregnancy, Nick decides to stay with her to protect his child. Amy narrates the final chapter, some months in the future. She notes the ways in which Nick has behaved like the perfect husband, but dwells on a criticism he let slip, suggesting that she will soon turn against him again.

### 4. *Gone Girl*: Film

The film closely adheres to the novel, although it necessarily compresses events and omits much of Nick and Amy's interior monologues (parts of which remain as voice-overs). Overall, it follows the same structure, from Nick's opening reverie about Amy's head—which provides the film's opening and closing images—to the protagonists' alternating scenes and timelines. The film reduces the role of Nick's father and places greater emphasis on the presence and effect of the media. The film drops the character of Hilary Handy and the final scene hinting that Amy may turn on Nick. More significantly, the film walks back the idea that Nick retains any affection for Amy at the end; instead, Amy tells him that he could never replace her and Go speculates that Nick must want to stay with Amy. Nick maintains that he has to stay with Amy for the good of their unborn child.

### D. This Case

Plaintiff initiated this suit in December 2017. [1]. She amended her

complaint in February 2018. [55]. Count I of Plaintiff's amended complaint alleges direct copyright infringement by Flynn, Fincher, Penguin Random House, and Twentieth Century Fox in violation of Section 106 of the Copyright Act, 17 U.S.C. § 106. *Id.* at 25–27. Count II alleges vicarious copyright infringement by Penguin Random House, Papandrea, Witherspoon, Dixon, and Twentieth Century Fox, again in violation of Section 106. *Id.* at 27–28. By agreement, the parties requested and obtained a stay of discovery. [69].

All Defendants moved to dismiss. This opinion addresses motions by Penguin Random House, Twentieth Century Fox, Papandrea, Witherspoon, Fincher, and Flynn to dismiss Plaintiff's complaint for failure to state a claim [70, 73, 77], and Witherspoon and Papandrea's motion to dismiss for lack of personal jurisdiction [75].[4]

## II. Legal Standard

When a defendant moves to dismiss a claim under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff has the burden of proving jurisdiction. *Purdue Research Found. v. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). If the court decides the motion without an evidentiary hearing, the plaintiff need only make out "a *prima facie* case of personal jurisdiction." *Hyatt Int'l Corp. v. Coco*, 302 F.3d 707, 713 (7th Cir. 2002). In considering the parties' written submissions this Court resolves factual disputes in the plaintiff's favor. *See Purdue Research*, 338 F.3d at 782. But if the defendant

---

[4] The record indicates that Plaintiff never served Dixon. Because the allegations against Dixon match those against the other defendants involved in making the film, any claims against her fall with those leveled against the other film-related defendants.

offers evidence challenging personal jurisdiction, the plaintiff may not rest upon the pleadings. *See id*. at 783. This Court accepts "as true any facts contained in the defendant's affidavits that remain unrefuted by the plaintiff." *GCIU-Emp'r Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1020 n.1 (7th Cir. 2009).

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must contain "sufficient factual matter" to state a facially plausible claim permitting "the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556, 570). Thus, "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Limestone Dev. Corp. v. Village of Lemont*, 520 F.3d 797, 803 (7th Cir. 2008).

In evaluating a complaint, this Court accepts all well-pleaded allegations as true and draws all reasonable inferences in the plaintiff's favor. *Iqbal*, 556 U.S. at 678. This Court does not, however, accept a complaint's legal conclusions as true. *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). On a motion to dismiss, this Court may consider the complaint itself, documents attached to the complaint, documents central to the complaint and to which the complaint refers, and information properly subject to judicial notice. *Williamson*, 714 F.3d at 436.

## III. Analysis

This Court addresses Papandrea and Witherspoon's jurisdictional challenge before turning to Defendants' motions to dismiss for failure to state a claim. Because Plaintiff cannot prevail on her claim for vicarious copyright infringement unless she establishes direct copyright infringement, *see Frerck v. John Wiley & Sons, Inc.*, No. 11-cv-2727, 2014 WL 3512991, at *9 (N.D. Ill. July 14, 2014), this Court focuses upon her direct infringement claim. Defendants adopt or substantially mirror each other's arguments on that issue, *see* [70] at 1, [73] at 12, [77] at 1, so this Court addresses their motions together.

### A. Personal Jurisdiction

Plaintiff's suit arises under the Copyright Act, which does not authorize nationwide service of process. *See MG Design Assocs., Corp. v. Costar Realty Info., Inc.*, 224 F. Supp. 3d 621, 628 (N.D. Ill. 2016). Accordingly, this Court may exercise personal jurisdiction over Witherspoon and Papandrea only if the United States Constitution and Illinois law permit it. *See id.* Illinois allows courts to exercise personal jurisdiction to the extent permitted by the Fourteenth Amendment's Due Process Clause, so this Court focuses upon the federal constitutional inquiry. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d 421, 425 (7th Cir. 2010). Following the federal standard, this Court may exercise personal jurisdiction over nonresidents only when they have "minimum contacts" with Illinois such that litigating the case here "does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (internal quotation marks omitted).

There are two types of personal jurisdiction. General jurisdiction exists when the party's affiliations with the forum state "are so constant and pervasive as to render [it] essentially at home" there. *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (internal quotation marks omitted). Specific jurisdiction depends upon the facts of the case and exists when the defendant has "purposefully directed his activities at residents of the forum" and "the litigation results from alleged injuries that arise out of or relate to those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472–73 (1985) (internal quotation marks omitted).

Plaintiff has not asserted that this Court may exercise general jurisdiction over Defendants, so this Court considers "only the propriety of specific jurisdiction." *Hyatt*, 302 F.3d at 713. Plaintiff must therefore show that: (1) Witherspoon and Papandrea "purposefully directed" their activities at Illinois or purposefully availed themselves "of the privilege of conducting business" in Illinois; and (2) Plaintiff's injury arises out of their "forum-related activities." *Tamburo v. Dworkin*, 601 F.3d 693, 700, 702 (7th Cir. 2010) (citing *Burger King*, 471 U.S. at 472); *see also Calder v. Jones*, 465 U.S. 783, 790 (1984) ("Each defendant's contacts with the forum State must be assessed individually.").

In support of her case for personal jurisdiction, Plaintiff alleges that Witherspoon and Papandrea negotiated with Flynn, an Illinois resident, to option the novel *Gone Girl* and that they produced the film, thereby exercising some control over its development. *See* [55] ¶¶ 8, 9, 48, 116. Plaintiff cites articles and public statements supporting her claim that Witherspoon and Papandrea optioned

the book and produced the film. *See* [83-3, 83-4, 83-5]. Plaintiff also alleges that Witherspoon and Papandrea brokered Twentieth Century Fox's deal with Flynn, [55] ¶ 24, but fails to rebut their affidavits swearing that Fox and Flynn reached a deal independently, *see* [76-1] ¶ 4.

Indeed, Plaintiff rebuts few of Defendants' sworn statements; this Court therefore accepts as true that Witherspoon and Papandrea made no creative contributions to the film's storyline, exercised no control over the film's production, never visited Illinois in connection with the film, and played no role in distributing or advertising the film. *See id.* ¶¶ 4–8; *GCIU-Emp'r Ret. Fund*, 565 F.3d at 1020 n.1. Likewise, Plaintiff's general allegation that all Defendants caused some injury in Illinois and/or targeted Illinois cannot withstand Witherspoon and Papandrea's affidavits to the contrary. *See* [55] ¶ 3; *GCIU-Emp'r Ret. Fund*, 565 F.3d at 1020 n.1. Thus, Witherspoon and Papandrea's only relevant contacts with Illinois are the conversations they had with Flynn about adapting the novel, possibly culminating in an option contract. *See* [76-1] ¶¶ 2–4; *see also* [83] at 7–8.

On these facts, Plaintiff fails to make out a prima facie case for personal jurisdiction. An "individual's contract with an out-of-state party" cannot, on its own, "establish sufficient minimum contacts" with the forum state. *Burger King*, 471 U.S. at 478. Thus, even assuming that Witherspoon and Papandrea entered an option contract with Flynn, that alone does not establish specific jurisdiction. The question becomes whether the contract's attendant circumstances—including "prior negotiations," "contemplated future consequences," and "the parties' actual course of

dealing"—demonstrate a sufficient connection to the forum by showing that the defendant "purposefully established minimum contacts" in that state. *Id.* Overall, this Court must ask whether an individual defendant's suit-related conduct connects her to the forum "in a meaningful way." *Walden v. Fiore*, 134 S. Ct. 1115, 1122, 1125 (2014). This inquiry turns on "the defendant's contacts with the forum State itself," not her contacts "with persons who reside there." *Id*. at 1122.

Here, Witherspoon and Papandrea's suit-related contacts with Illinois consist solely of their conversations and possible option contract with Flynn. That contract appears to have been essentially superseded by Flynn's contract with Fox, and in any event prompted no additional contacts between Defendants and Illinois; thus, it lacks the contextual factors necessary to show that Defendants "purposefully established minimum contacts" with Illinois. *Burger King*, 471 U.S. at 479. True, Witherspoon and Papandrea played some role in the film's production and it was distributed globally, including in Illinois. *See* [76-1] ¶ 5; [55] ¶¶ 3, 8–9, 91. But Plaintiff acknowledges that Twentieth Century Fox distributed the film, *see* [55] ¶ 10, and Witherspoon and Papandrea attest that they took no part in the film's distribution or marketing, [76-1] ¶¶ 5–7. Thus, neither defendant personally "targeted" Illinois, *see Advanced Tactical Ordnance Sys., LLC v. Real Action Paintball, Inc.*, 751 F.3d 796, 802–03 (7th Cir. 2014), or otherwise established meaningful "contacts, ties, or relations" here, *Burger King*, 471 U.S. at 472 (quoting *Int'l Shoe*, 326 U.S. at 319); *cf. Carter v. Pallante*, 256 F. Supp. 3d 791, 795–97 (N.D. Ill. 2017) (finding personal jurisdiction where the defendants sold unauthorized

licenses specifically for the plaintiff's songs to be performed in Illinois).

The Seventh Circuit has distinguished between developing and distributing entertainment for jurisdictional purposes. *See Colo'n v. Akil*, 449 F. App'x 511 (7th Cir. 2011). In *Colo'n*, the court found that non-resident producers of a television program were not subject to personal jurisdiction in Indiana because they played no role in broadcasting the show in that state. *See id.* at 514. This conclusion follows from long-settled precedent that the relevant minimum contacts must be created by each defendant *herself*. *See Walden*, 134 S. Ct. at 1122. Here, Twentieth Century Fox's efforts to distribute the film in Illinois cannot be imputed to Witherspoon and Papandrea on the basis of any independent contribution they made to the film's production. *See id.*; *Calder*, 465 U.S. at 790; *Colo'n*, 449 F. App'x at 514; *see also Palnik v. Westlake Entm't, Inc.*, 344 F. App'x 249, 252–54 (6th Cir. 2009) (finding no personal jurisdiction over non-resident producers who played no role in the movie's distribution in the forum state).

In short, Witherspoon and Papandrea's suit-related contacts with Illinois are at best "fortuitous" and "attenuated," and therefore cannot sustain this Court's exercise of personal jurisdiction. *Burger King*, 471 U.S. at 475. This Court denies Plaintiff's request for jurisdiction-related discovery. *See* [83] at 6. Plaintiff fails to establish a prima facie case for personal jurisdiction, which is a threshold requirement for discovery. *See, e.g.*, *Cent. States, Se. & Sw. Areas Pension Fund v. Phencorp Reinsurance Co., Inc.*, 440 F.3d 870, 877 (7th Cir. 2006). Accordingly, this Court dismisses Plaintiff's claims against Witherspoon and Papandrea.

### B. Access

To state a claim for copyright infringement, Plaintiff must show: (1) "ownership of a valid copyright"; and (2) "unauthorized copying" of the copyrighted work's "original" elements. *Peters v. West*, 692 F.3d 629, 632 (7th Cir. 2012). Defendants do not contest OTB3's copyright. *See generally* [71, 74]. To satisfy the second element of her claim, Plaintiff must show that Defendants "actually copied" her work. *Design Basics, LLC v. Lexington Homes, Inc.*, 858 F.3d 1093, 1099 (7th Cir. 2017). Because direct evidence of copying is rarely available, "a plaintiff may prove copying by showing that the defendant had the opportunity to copy the original (often called 'access') and that the two works are 'substantially similar.'" *Peters*, 692 F.3d at 633. An inference of access may also arise from "proof of similarity which is so striking that the possibilities of independent creation, coincidence and prior common source are, as a practical matter, precluded." *Design Basics*, 858 F.3d at 1100 (quoting *Selle v. Gibb*, 741 F.2d 896, 901 (7th Cir. 1984)). Although such "striking" similarity may obviate the need to prove access, "access cannot serve as a proxy for substantial similarity." *Id*.

Establishing access requires Plaintiff to demonstrate a "reasonable possibility of access" to her original work. *Id*. at 1105. This may arise where "the copyrighted work was sent directly to the defendant" or "a close associate of the defendant." *Id*. at 1100 (internal quotation marks omitted).[5] Courts in this district have also sustained claims of access based upon a "channel of communication" or a

---

[5] Plaintiffs may also show that the copyrighted work "was so widely disseminated that the defendant can be presumed to have seen or heard it," *Design Basics*, 858 F.3d at 1100, but Plaintiff makes no such contention here.

"nexus" between the parties. *Francescatti v. Germanotta*, No. 11-cv-5270, 2014 WL 2767231, at *4 (N.D. Ill. June 17, 2014); *see also Le Moine v. Combined Commc'ns Corp.*, No. 95-c-5881, 1996 WL 332688, at *4 (N.D. Ill. June 13, 1996).

Here, Plaintiff does not allege that OTB3 "was sent directly" to any defendant or a "close associate" of any defendant. *Design Basics*, 858 F.3d at 1100. Instead, Plaintiff contends that she sufficiently alleges a channel of communication bridging Plaintiff and Flynn (Plaintiff does not claim that any other defendant obtained access to OTB3, except through Flynn's work). *See* [85] at 9–10; [55] ¶¶ 47–48. Her allegations, however, fail to show the nexus between the parties required by every relevant precedent.

Plaintiff's allegations do not demonstrate an identifiable "channel" of communication. On one end of the alleged chain of access, Plaintiff gave OTB3 to Alessandra, a script consultant, in May 2008. [55] ¶ 28. On the other end, LGR became Flynn's literary agent around July 2011. *Id.* ¶ 45. The supposed link between these events is Alessandra's collaboration with Ellis and Lamson while Ellis was represented by LGR. *See id.* ¶¶ 31–36. To find that these bare allegations demonstrate access, this Court would have to infer that Alessandra gave Ellis a copy of OTB3, and Ellis—before her death in 2011—passed it on to LGR. Some unspecified person at LGR must then have made it available to Flynn.

Plaintiff does not specifically allege that any of this happened. Instead, she describes a chain of professional relationships—most of which have no relation to *Gone Girl*—and invites speculation that some unidentified intermediary, for some

reason, showed Flynn—who was by then two years into her work on the novel—an unproduced screenplay by a writer whom LGR did not represent. *See id.* ¶¶ 18–20, 30–47. Indeed, Plaintiff's allegations are so undeveloped that she now offers two theories of access based upon the same sparse facts. *See* [85] at 10 (LGR may have connected Flynn with Ellis, or LGR "could have connected Flynn directly with Alessandra"). True, Plaintiff need only show a "reasonable possibility of access." *Design Basics*, 858 F.3d at 1105. But the federal pleading standards still apply, and Plaintiff's allegations fall short of plausibility. *See Iqbal*, 556 U.S. at 678.[6]

Plaintiff's proffered authorities do not alter this analysis. Though decided at summary judgment, the facts of these cases illustrate the types of connections that may actually permit a "reasonable inference of access." *Selle*, 741 F.2d at 902. In *Francescatti*, for example, the district court found that access could exist where the plaintiff songwriter claimed that she shared her work directly with a sound engineer who contributed to the album containing the allegedly infringing song. *See* 2014 WL 2767231, at *2, 5. A different court found that another songwriter could prove access where he claimed that he gave his song to CBS, and a CBS officer told him that CBS would make it available to a group of CBS artists that included the alleged infringer. *See Sanford v. Columbia Broad. Sys., Inc.*, 594 F. Supp. 711, 712–13 (N.D. Ill. 1984). In each case, the plaintiff's copyrighted work reached an intermediary directly connected to the allegedly infringing material. Plaintiff offers no such allegations here. As such, she simply fails to connect the dots.

---

[6] As an alternative, Plaintiff contends that Alessandra's "professional relationships" with CAA—Flynn's agency as to film rights—also demonstrate access. *See* [55] ¶¶ 45–46; [85] at 10 n.3. That theory rests equally upon speculation and fails for the same reasons.

In sum, Plaintiff's speculative and attenuated theory of access cannot withstand Defendants' motions to dismiss. *Cf. Peters*, 692 F.3d at 634 (holding that the plaintiff sufficiently alleged access in claiming that he gave his song to the defendant's manager on the relevant album, with whom defendant collaborated).

## C. Similarity

Even if Plaintiff successfully alleged access, she cannot show that the works are substantially similar, let alone of such "striking" similarity that she need not demonstrate access. *See Design Basics*, 858 F.3d at 1100. Because the similarity inquiry is dispositive, this determination serves as alternate grounds for this Court's dismissal of Plaintiff's complaint. *See Hobbs v. John*, No. 12-C-3117, 2012 WL 5342321, at *3 (N.D. Ill. Oct. 29, 2012), *aff'd* 722 F.3d 1089 (7th Cir. 2013).

To determine if two works are substantially similar, courts ask "whether the accused work is so similar to the plaintiff's work that an ordinary reasonable person would conclude that the defendant unlawfully appropriated" the plaintiff's "*protectable* expression." *Design Basics*, 858 F.3d at 1101. Crucially, the Copyright Act protects only "the particular expression of an idea" found in a given work, not "the idea itself." *Atari, Inc. v. N. Am. Philips Consumer Elecs. Corp.*, 672 F.2d 607, 615 (7th Cir. 1982), *superseded by statute on other grounds as recognized in Scandia Down Corp. v. Euroquilt, Inc.*, 772 F.2d 1423, 1429 (7th Cir. 1985). So, too, a copyright does not protect "stock" characters or "*scènes à faire*"—in other words, characters, events, or other features of a work "that are so rudimentary, commonplace, standard or unavoidable that they do not serve to distinguish one work within a class of works from another." *Gaiman v. McFarlane*, 360 F.3d 644,

659 (7th Cir. 2004) (internal quotation marks omitted).  Likewise, "common words and phrases" receive no protection.  *UIRC-GSA Holdings Inc. v. William Blair & Co., LLC*, No. 15-cv-9518, 2017 WL 1163864, at *3 (N.D. Ill. Mar. 29, 2017) (citing *Peters*, 692 F.3d at 635–36).

Thus, any purportedly shared elements must be protectable to demonstrate substantial similarity.  *See Hobbs*, 722 F.3d at 1094–96; *Gentieu v. Tony Stone Images/Chi., Inc.*, 255 F. Supp. 2d 838, 848 (N.D. Ill. 2003).  This Court therefore disregards Plaintiff's alleged similarities that represent either common phrases or incidents standard to any story depicting a deteriorating marriage.  *See* [55] ¶ 60 (the couple argue while the husband gets a drink and "'tosses' something"); ¶¶ 62, 75 (the husband does not need or want his wife's permission to go out); ¶ 63 (the husband "almost" gets caught with his mistress); ¶ 75 (the wife wishes to "start over"); ¶ 79 (the couple paints their new home; one spouse maintains contact with an ex).  This Court also disregards misrepresentations of the works in Plaintiff's complaint; for example, OTB3 never suggests that Steve is "guilty" of a crime or has already harmed Mary, *id.* ¶ 52; Nick never suggests that he and Amy go to a beach, *id.* ¶ 65; Go (unlike Mark) is not an "outcast" in her family, *id.* ¶ 69; and Mary is actually—not purportedly—pregnant at the time of the car accident, *id.* ¶ 77.

Turning to the ostensibly protectable elements of OTB3, this Court compares the "central characters, theme, and plot" of OTB3 and *Gone Girl.  Tillman v. New Line Cinema Corp.*, 295 F. App'x 840, 842–43 (7th Cir. 2008); *see also Atari*, 672 F.2d at 614–16.  In dramatic works, the characters and plot may assume particular

importance.  *See Atari*, 672 F.2d at 616.  Because the novel and film versions of *Gone Girl* are so similar, this Court addresses them together, noting distinctions as appropriate.  *See Williams v. Crichton*, 84 F.3d 581, 587 (2d Cir. 1996) (evaluating substantial similarity as to the challenged novel and derivative film together).  Applying the objective "ordinary observer test," *Atari*, 672 F.2d at 614, this Court looks to the works themselves to determine substantial similarity, *see JCW Invs., Inc. v. Novelty, Inc.*, 482 F.3d 910, 916 (7th Cir. 2007).

### 1.    Characters

Plaintiff alleges similarities between the "female lead" and "male lead" of the works, referring to Amy and Mary and Nick and Steve, respectively.  [55] ¶¶ 67–69. This Court finds no substantial similarity between these protagonists.

Amy comes from New York City's upper class, the product of boarding school and multiple institutions of higher education.  She is somewhat famous and, initially, wealthy, thanks to her parents' "Amazing Amy" series.  When she meets Nick, she works as a quiz-writer for magazines.  Before the plot twist reveals Amy's psychotic vendetta against Nick, her (falsified) diary entries portray her as witty, charming, and accommodating, while Nick recalls her demanding nature.  The events following the twist reveal Amy to be brilliant, cold, and calculating, ready to punish anyone who diminishes her.  Amy methodically plots to frame first Nick and then Desi.  She revels in the ease with which she assumes different personas and how fully Nick fell for her "cool girl" act.

Mary, by contrast, comes from a lower-class background that Steve's family disparages, and initially appears demure and naïve.  She has no stated job and

wants to be a stay-at-home mom for Little Steve. When, post-coma, Mary becomes more aggressive, her goal remains reclaiming her family and she becomes increasingly jealous of Eileen. Although the audience realizes that Mary staged her car accident, nothing in OTB3 suggests that this plan was particularly complex. Moreover, she devised it with her ex, Carl, rather than on her own. After Mary's coma, she acts impulsively and recklessly—attracting the attention of the police when she punctures Steve's tires, showing up at Steve's house to have sex while Eileen is in the shower, and trying and failing to kill first Steve and then Eileen.

Although both Mary and Amy initially present more obliging versions of themselves to Steve and Nick, Mary's subsequent transformation results significantly from the external circumstances of her coma and Steve's remarriage, while Amy consistently acts on her own desires and instincts. Mary impulsively and unsuccessfully tries to kill Steve and Eileen, while Amy successfully stages a fake murder (her own) and a real one (Desi's), which she sets up to look like self-defense. Mary acts out of passion for Steve; Amy is her own priority. In short, these women possess different backgrounds, motives, and temperaments. *See, e.g.*, *Williams*, 84 F.3d at 589 (finding no substantial similarity where characters displayed differences in motives, skills, and "interpersonal relationships").[7]

Nick and Steve are likewise distinct. Steve actually is the arrogant, entitled frat-boy that people believe Nick to be, while Nick desperately wants to please

---

[7] Considering the full content of the works, Plaintiff's reliance on certain immaterial parallels fails to draw any meaningful comparisons between the two characters—indeed, finding Amy and Mary to be similar here would be akin to saying Michael Corleone and George Bailey are similar simply because they both take over the family business during the turmoil following the death of their fathers.

everyone he meets. Steve comes from money and Nick grew up strictly working-class. Steve is homophobic and bluntly cruel to his gay brother Mark; Nick's twin Go is his closest friend. Steve marries Mary to rebel against his parents; Nick marries Amy because he loves her—or the woman she pretends to be. Both men fall out with their wives and behave badly toward them, but Steve's bad behavior extends into a second marriage; in any event, such a souring marriage—complete with an affair and excessive alcohol—is the sort of *scène à faire* that the Copyright Act does not protect. *See Gaiman*, 360 F.3d at 659.

Plaintiff contends that both Steve and Nick become attracted to Mary and Amy after discovering their dangerous sides. *See, e.g.*, [84] at 15–16. This may be true of Steve, but Nick hates the Amy he has come to know. True, Nick admits—in the novel, if not the film—that he could never replace Amy (notably, this is not a sentiment discernable in Steve, who initially deems Eileen a reasonable replacement for Mary). But while Steve likes Mary's aggression, Nick remains strangely drawn not to the violence Amy displays in murdering Desi, but to what it represents: the force of her passion to reunite with him. The extreme steps she is willing to take appeals to his need to be needed, a trait *Gone Girl* explores at length.

Contrary to Plaintiff's contention, nothing in *Gone Girl* suggests that Amy's violence attracts Nick, or that he wants to "commit" to her because of it. *Id*. at 16. Rather, Nick remains fascinated and obsessed with Amy, and yet loathes her at the same time; he plans to leave her until she reveals her pregnancy. The relationships in these works thus only resemble each other at a highly abstracted level—the idea

of a toxic relationship is hardly new,[8] and certainly not protectable. *See Atari*, 672 F.2d at 615–16 (generalized ideas are not protected by copyright).

In sum, these protagonists have little in common at the protected level. Moreover, a quick glance at other important characters shows equally dramatic distinctions: Mark, Steve's brother, plots revenge against him, while Go is Nick's strongest supporter; June, Mary's mother, is single, and "worn from a hard life," while Amy's parents are well-off and in love; Carl, Mary's ex, is a racecar driver who wears "Wal-Mart's best blue jeans," while Desi, Amy's ex, is even wealthier and more meticulously coiffed than she is. Nor does OTB3 offer any possible inspiration or analog for the other characters that populate *Gone Girl*, including the detectives, cable news hosts, and neighbors so key to *Gone Girl*'s plot. Such numerous and significant differences influence "the ordinary observer" and thus weigh against finding substantial similarity. *Atari*, 672 F.2d at 618.

## 2. Themes

Plaintiff claims that OTB3 and *Gone Girl* share the "central theme" of "how well one person can really know another person." [55] ¶ 78. Such a highly generalized theme, explored in countless works of fiction, remains unprotectable. *See Stromback v. New Line Cinema*, 384 F.3d 283, 297 (6th Cir. 2004) (citing *Cavalier v. Random House, Inc.*, 297 F.3d 815, 823 (9th Cir. 2002) ("Familiar"

---

[8] Notable examples might include Lord and Lady Macbeth in *Macbeth*, Catherine and Heathcliff in *Wuthering Heights*, Carmen and Don José in *Carmen*, and Martha and George in *Who's Afraid of Virginia Woolf?*.

themes that are "staples of literature are not protected.")).[9]  Even if protectable, the works explore this theme differently, which weighs against similarity.  *See Funky Films, Inc. v. Time Warner Entm't Co.*, 462 F.3d 1072, 1079 (9th Cir. 2006).

*Gone Girl* looks at the social facades that men and women assume, and what happens when those masks slip.  The "cool girl" persona that Amy takes on when meeting Nick matches his idealized expectation of a desirable woman; Amy's hatred of Nick stems, in large part, from her realization that when she dropped that persona Nick no longer loved her.  Similarly, when Nick loved Amy he strove to be his "best" self for her, but withdraws as she becomes colder.  Later, engulfed in the police investigation, Nick appears guiltiest when his public appearances deviate from social expectations of how a grieving husband should behave.  In the end, the public remains wholly and happily deceived by the reunion Amy and Nick perform for the media.  Within their relationship, Nick and Amy now know their partner's true self, but Nick remains forced to abide by Amy's demanding expectations under the threat of renewed violence and his concern for their child.  Thus, among other things, *Gone Girl* suggests that people often prefer an idealized version of life to the darker, flawed reality.

In contrast, OTB3 has nothing terribly insightful to say about the human condition, and fails to provide any answer to the question "how well one person can really know another."  Steve and the audience initially perceive Mary to be docile and vulnerable, an image dispelled by the revelation that Mary plotted with Carl to

---

[9] Here, the list of relevant works might read like a syllabus for a freshman literature class.  *See, e.g.,* William Shakespeare, Othello act 1, sc. 1 ("I am not what I am"); Jane Austen, Pride and Prejudice (1813); Charles Dickens, A Tale of Two Cities (1859); Harper Lee, To Kill A Mockingbird (1960).

kill Steve. Steve may not "really know" Mary when he meets her, but Carl appears to know her well. On the other hand, Mary does not "really know" Carl, since she appears unaware of his relationship with Mark. Eileen, however, remains what she appears to be (trusting, maternal), as does Steve (arrogant and entitled). To the extent that these characters illuminate the theme, they suggest that people in relationships may sometimes hide their true motives. OTB3 also focuses entirely upon interpersonal interactions rather than social expectations or unrealized ideals.

Such distinct treatments of the theme represent a substantial difference between the works. *See Funky Films*, 462 F.3d at 1079–80. Plaintiff's contention that the works treat the theme similarly because both employ "a visual of the female lead's head" is unpersuasive. *See* [55] ¶ 71; [85] at 18. The "visual" in OTB3 shows Mary at the scene of the car crash, depicting her face "covered in blood," while the image in *Gone Girl* is specifically of Amy's "head," not her face, within a totally different context. The former foreshadows the violence to come; the latter emphasizes Amy's mystery. Here, too, the works offer different expressions of a general idea, which does not prove infringement. *See, e.g.*, *Hobbs*, 722 F.3d at 1094. Finally, *Gone Girl* explores numerous themes lacking any analog in OTB3— including the effects of economic insecurity, the failures of a superficial media, different incarnations of misogyny, and the public fascination with crime—which also weighs against finding similarity. *See Williams*, 84 F.3d at 589.

### 3. Plot

As should be clear from the summaries above, the plots of OTB3 and *Gone Girl* differ in numerous and important ways. Amy frames Nick for her (faked)

death; Mary tries to kill Steve and ends up in a (real) coma. Mary first plots with Carl against Steve, then with Steve against Eileen, while Amy pursues her own ends solo. Steve divorces Mary for Eileen and then cheats on Eileen with Mary; Nick cheats on Amy but is prevented from divorcing her, first by her faked disappearance, and then by the combination of Amy's threats and pregnancy. The "sequence of events" in OTB3 traces the interactions of five lovers, four of whom engage in machinations and secret affairs that lead to crimes of passion. *See Atari*, 672 F.2d at 616 n.8. In *Gone Girl*, the police investigation into Amy's disappearance shapes the plot, though its focus expands to draw in Nick and Amy's history and to lay out Amy's intricate deceptions. Quite simply, the works "tell different stories." *Hobbs*, 722 F.3d at 1096 (internal quotation marks omitted).

Again, to the extent that the works share any plot elements, they do so at the level of unprotected general ideas or *scènes à faire*. A wife plotting against her husband, a jealous or vengeful lover, an alienated husband, and a woman who is more dangerous than she appears are no more protectable than the stock characters that evolved from the *commedia dell'arte* or any other "standard features" of a genre. *See Gaiman*, 360 F.3d at 659–60 (stock characters remain unprotected because they "are the products not of the creative imagination but of simple observation of the human comedy"); Joseph P. Bauer, *Copyright and the First Amendment: Comrades, Combatants, or Uneasy Allies?*, 67 Wash. & Lee L. Rev. 831, 870 (2010) (Copyright protection "may be withheld from certain elements of a work which are 'pre-ordained' by the work's unprotectable ideas; examples of this are

certain basic plot or character qualities, which would typically be found in any work of that type."). Certainly, the distinct expressions of such stock elements can be protectable, *see Gaiman*, 360 F.3d at 660–61, but OTB3 and *Gone Girl* offer entirely different expressions of such tropes: Amy plots to frame Nick, but Mary plots to kill Steve; Desi is jealous of Nick because of Amy, while Carl is secretly involved with Mark and hates Steve for his sake. Thus, *Gone Girl*'s plot does not infringe upon the protectable elements of OTB3. *See id.*; *see also Funky Films*, 462 F.3d at 1081 (plot ideas are not protectable at a "high level of generality"); *Walker v. Time Life Films, Inc.*, 784 F.2d 44, 49–50 (2d Cir. 1986) (finding two works dissimilar, despite sharing a basic storyline, in light of significant differences in plot details and "dramatic structure").

### 4. Additional Elements

In addition to the elements already discussed, courts often consider pacing, structure, mood, dialogue, and setting. *See Tillman*, 295 F. App'x at 843 (collecting cases); *see also Funky Films*, 462 F.3d at 1077; *Stromback*, 384 F.3d at 297; *Williams*, 84 F.3d at 588. The works display countless and significant differences within each of these categories, of which this Court provides only a few examples.

The pacing differs in that *Gone Girl* builds tension deliberately, often by playing Nick and Amy's narratives off each other, with carefully spaced reveals—including Amy's (first, fake) pregnancy and Nick's affair—periodically jolting the story forward. OTB3, by contrast, starts slowly, showing Mary and Steve's courtship, and then shifts into high gear after Mary's coma and stays there, speeding through reveals, twists, and acts of violence.

The structures of the works differ most obviously in their use of time. *Gone Girl* first switches between Nick's present and Amy's past, narrated by diary entries covering seven years. The second part finds Amy's narrative still trailing Nick's by some days, until their stories converge in the final section. OTB3, by contrast, contains a single flash-forward and then proceeds strictly chronologically.

Finally, *Gone Girl* provides specific settings, mainly New York City in the 2000s and the (fictional) North Carthage, Missouri, in 2012. North Carthage is a suburban town buffeted by the Recession; its mall—a key source of employment— recently closed and many homes bear foreclosure signs. OTB3 never locates its setting in a real-world place or time. It never depicts the town where Steve and Mary live, though it mentions an ocean and cliffs, suggesting perhaps the American west coast. It shares no traits with New York and it resembles North Carthage only in its generic suggestions of suburbia—Eileen visits a mall, the houses have yards, and everyone drives. North Carthage's deliberately Midwestern feel and location on the Mississippi river sufficiently distinguish it from the generic and nameless setting of OTB3. *See Herzog v. Castle Rock Entm't*, 193 F.3d 1241, 1260 (11th Cir. 1999) (distinguishing "small town" settings showing distinct characterization).

Overall, no ordinary observer could conclude that OTB3 and *Gone Girl* are substantially similar. Their common elements are standard in thrillers and at the level of particular expression they tell very "different stories." *Hobbs*, 722 F.3d at 1096. Plaintiff's alleged similarities either rely upon distortion or remain "too general or tenuous to meet the legal standard for similarity." *Stromback*, 384 F.3d

at 298.  To take one example, Plaintiff notes that in both works "the reader learns that the wife was purportedly pregnant at the time of the incident."  [55] ¶ 51.  The relevant "incident" in OTB3 is the car accident; in *Gone Girl* it is Amy's disappearance.  The car accident is real, albeit intentional; the disappearance is staged.  In *Gone Girl*, Nick discovers that this particular pregnancy is another one of Amy's ruses.  In OTB3, Mary is truly pregnant at the time of the car accident but learns of it upon waking from her coma.  The vast majority of Plaintiff's alleged similarities rely upon such selectively truncated accounts of the works, avoiding the differences in expression that undermine her claim.

In sum, the works are not "substantially similar" as a matter of law and this Court dismisses Plaintiff's claims with prejudice.  *See Hobbs*, 722 F.3d at 1096 (affirming dismissal of direct infringement claim with prejudice for lack of substantial similarity); *Frerck*, 2014 WL 3512991, at *9 (vicarious infringement requires showing of direct infringement).

## IV.  Conclusion

For the reasons explained above, this Court grants Defendants' motions to dismiss with prejudice [70, 73, 75, 77].  Judgment is entered in favor of Defendants and against Plaintiff.  Civil case terminated.

Dated:  May 21, 2018

Entered:

John Robert Blakey
United States District Judge

33